[No. 43665. En Banc. January 8, 1976.]

WEYERHAEUSER COMPANY, *Respondent*, v. THE DEPARTMENT OF ECOLOGY, *Appellant*.

*Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant,* and *Joseph J. McGoran, Assistant,* for appellant.

*Lane, Powell, Moss & Miller, G. Keith Grim,* and *Robert R. Davis, Jr.,* for respondent.

HOROWITZ, J.—This case presents a question of first impression concerning the validity of regulations adopted by the Department of Ecology (appellant) to govern its approval of applications for tax credit and exemption certificates under RCW 82.34. We conclude the regulations are valid as a permissible interpretation and implementation of RCW 82.34.

For 18 years Weyerhaeuser Company (respondent) operated in its Longview kraft paper mill three recovery boilers which performed two functions essential to the profitable production of pulp: (1) recovery of chemicals used in the pulping of wood chips, and (2) production of heat for steam used in the mill. Proper maintenance would have

allowed these boilers to operate indefinitely at the same production levels.

In 1969 appellant issued regulations controlling gaseous emissions of sulphur into the atmosphere from kraft pulping mills. WAC 18-36. Respondent concluded the most practical and economical way to meet these standards at its Longview mill was to replace the three existing boilers with one new and larger boiler (Boiler #10). Boiler #10 was not designed to increase pulp production. It was designed only to meet the 1975 sulphur emission limits, and perform the manufacturing function of the boilers replaced at the same production level. However, it should be pointed out Boiler #10 has a capacity somewhat in excess of the capacity required to handle current production levels; this excess capacity is to insure the boiler will comply with the emission limits regardless of daily fluctuations in pulp production. Boiler #10 also cuts operating costs at the mill approximately $500,000 per year. However, this sum is only about a 2½ percent return on the total cost of the new boiler and new related equipment ($19.8 million). On the other hand, Boiler #10 will provide a larger depreciable basis than that of the replaced boilers.

RCW 82.34 provides an applicant who installs a qualified pollution control facility is entitled to a tax credit and exemption certificate, which allows recovery of up to 55 percent of the capital cost of the facility over a 25-year period.

In 1970 respondent applied to appellant for such a certificate for the entire cost of Boiler #10. On December 7, 1972, appellant denied the application for such certificate. On January 10, 1973, respondent appealed to the Pollution Control Hearings Board (the board), pursuant to RCW 43.21B. On March 4, 1974, the board entered a final order, overturning appellant's denial of the certificate. The board found that although Boiler #10 performs functions essential to the profitable production of pulp at Longview, nevertheless, the sole reason for its installation was to meet, in the most economical manner, appellant's 1975 sulphur emission

limits. Therefore, the board concluded, respondent was entitled to the certificate for the entire cost of Boiler #10 because, in the words of RCW 82.34.030, it is "designed and is operated or is intended to be operated primarily for the control, capture and removal of pollutants from the air . . . ."

The Superior Court affirmed upon the same reasoning. Appellant appeals from the superior court judgment qualifying the entire cost of Boiler #10 for certification under RCW 82.34.

The "test" for determining the eligibility of Boiler #10 for a tax exemption certificate under RCW 82.34 is set out in RCW 82.34.030 as follows:

> A certificate shall be issued by the department [The Department of Revenue] within thirty days after approval of the application by the appropriate control agency [The Department of Ecology]. Such approval shall be given when it is determined that the facility is designed and is operated or is intended to be operated primarily for the control, capture and removal of pollutants from the air . . . and that the facility is suitable, reasonably adequate, and meets the intent and purposes of chapter 70.94 RCW [Washington Clean Air Act] . . .

It is clear from RCW 82.34.030 that the eligibility "test" is really three tests:

(1) The "facility" must be *designed* primarily for pollution control;

(2) The "facility" must be *operated* or intended to be operated primarily for pollution control;

(3) It must be suitable, reasonably adequate and meet the intent and purposes of RCW 70.94.

Both parties agree Boiler #10 meets tests (1) and (3). The dispute before the board and Superior Court, and on this appeal, is whether Boiler #10 has met test (2)—the operational test.

Appellant has adopted regulations (WAC 173-24) to administer the operational test. Appellant contends Boiler #10 does not meet the operational test of WAC 173-24-100 and

therefore cannot be certified under RCW 82.34 for 100 percent of its cost. The validity of these regulations, therefore, is the first question to be answered.

Respondent contends, and both the board (conclusion of law No. 7) and the Superior Court (conclusion of law No. 3) held that appellant's regulations, WAC 173-24, to the extent they deny certification of Boiler #10, are unlawful "because they are outside the framework and policy of chapter 82.34 RCW." For the reasons to follow, we disagree.

In determining the validity of WAC 173-24, we first note that where the legislature specifically delegates to an administrative agency the power to make rules, there is a presumption such rules are valid. Trautman, *Administrative Law Problems of Delegation and Implementation in Washington*, 33 Wash. L. Rev. 33, 54 (1958) (burden lies with person attacking agency rule); *see Malaga School Dist. 115 v. Kinkade*, 47 Wn.2d 516, 517, 288 P.2d 467 (1955) (burden is upon person asserting abuse of discretion by administrative agency). Thus, this court's review of such rules should normally go no further than to ascertain whether the rule is reasonably consistent with the statute it purports to implement:

> In the case of a legislative rule (*i.e.*, one adopted pursuant to a delegation of legislative power, the violation of which involves statutory sanctions), the queries would be: first, whether the rule related to the subject matter on which power to legislate had been delegated; second, whether the rule conformed to the standards prescribed in the delegatory statute; and third, whether the rule was invalid on constitutional grounds, such as due process.

1 F. Cooper, *State Administrative Law* 250 (1965). The court should not invalidate a legislative rule merely because it believes the rule is unwise:

> [T]he court is not free to substitute its judgment as to the desirability or wisdom of the rule, for the legislative body, by its delegation to the agency, has committed those questions to administrative judgment and not to judicial judgment.

1 K. Davis, *Administrative Law Treatise* § 5.05, at 315 (1958).

 Furthermore, this court has consistently given weight to an interpretation of an ambiguous statute by the agency charged with its administration:

> When a statute is ambiguous, the construction placed upon it by the officer or department charged with its administration, while not binding on the courts, is entitled to considerable weight in determining the intention of the legislature.

*State ex rel. Pirak v. Schoettler*, 45 Wn.2d 367, 371, 274 P.2d 852 (1954); *accord, Pierce County v. State*, 66 Wn.2d 728, 404 P.2d 1002 (1965); *White v. State*, 49 Wn.2d 716, 306 P.2d 230 (1957).

RCW 43.21A.080 grants appellant authority "to adopt such rules and regulations as are necessary and appropriate" to carry out its statutory duties. RCW 82.34.030 describes one such duty. This section requires "the appropriate control agency" to determine when each facility submitted for approval under RCW 82.34 has met the requisite three tests set forth above. RCW 82.34.010(6). Appellant is the "appropriate control agency." RCW 43.21A.020; RCW 82.34.010(6).

Moreover, the legislature, in establishing the Department of Ecology, vested appellant with very broad authority and responsibility for managing this state's environment.

> [I]t is the purpose of this chapter to establish a single state agency with the authority to manage and develop our air and water resources in an orderly, efficient, and effective manner and to carry out a coordinated program of pollution control involving these and related land resources. To this end a department of ecology is created by this chapter to undertake, in an integrated manner, the various water regulation, management, planning and development programs now authorized to be performed by the department of water resources and the water pollution control commission, the air regulation and management program now performed by the state air pollution control board, the solid waste regulation and management program authorized to be performed by state

government as provided by chapter 70.95 RCW, and such other environmental, management protection and development programs as may be authorized by the legislature.

RCW 43.21A.020. RCW 43.21A.900 also states:

The rule of strict construction shall have no application to this chapter and it shall be liberally construed in order to carry out the broad purposes set forth in RCW 43.21A.020.

Pursuant to the above statutory authority, appellant on August 4, 1971, issued regulations, codified in WAC 173-24. These regulations established procedures for performing its delegated duty to review the applications for tax benefits under RCW 82.34 received from the Department of Revenue, including appellant's criteria for granting or denying approval of these applications.

The portion of WAC 173-24 in question here constitutes appellant's interpretation and implementation of the "operational" test:

A facility is operated or intended to be operated primarily for the purpose of pollution control when:

(1) The emissions or effluents from the commercial or industrial operation do or will contain measurably less pollution with the facility installed than they would without the facility installed, and;

(2) The facility is not necessary to the manufacture of products. *Provided that*, a pollution control element of equipment necessary for the manufacture of products may be approved if such element meets the requirement of subsection (1) of this section and the manufacture of products could be undertaken at the present or proposed level . . . without the presence of the pollution control element or its equivalent.

WAC 173-24-100. WAC 173-24-030 (6) provides:

"Pollution control element" shall mean any part of a facility conceptually identifiable as necessary for pollution control pursuant to WAC 173-24-070.

WAC 173-24-030 (3) provides:

"Facility" shall mean any treatment works, control devices, disposal systems, machinery, equipment, structures

or property or any physically or conceptually identifiable part or accessories thereof for which a certificate is applied for under Chapter 82.34, RCW.

Thus, the operational test provided for in RCW 82.34.030, *supra*, is explained and implemented by WAC 173-24-100, *supra*, and definitional sections WAC 173-23-030(3) and (6), *supra*. The test is an objective, functional test designed to best fulfill legislative intent and purpose. In practical effect, in the case of a facility deemed "necessary to the manufacture of products," certification is permitted only to the extent of its cost attributed to pollution control.

The regulations so adopted are "entitled to considerable weight in determining legislative intent," (*Earley v. State*, 48 Wn.2d 667, 673, 296 P.2d 530 (1956)), unless compelling reasons are presented sufficient to show the scheme is in conflict with the intent and purpose of the legislation.

We therefore turn to an evaluation of three arguments respondent urges in support of its claim the operational test of WAC 173-24 is contrary to RCW 82.34.

1. Respondent's first argument is that RCW 82.34.030 requires only that the facility be operated "primarily" for pollution control; that such requirement clearly permits certification of some multifunctional facilities, namely facilities which perform other than exclusively pollution control functions; and that certification must be determined on the basis of a "but for" test, which focuses upon Weyerhaeuser's reason for installing the multipurpose facility rather than the function of the facility.

Therefore, respondent argues the "necessary to manufacture" exclusion of WAC 173-24-100(2) in its operational test, which requires only partial certification for such multifunctional facilities, is contrary to this legislative intent.

■ We disagree. A partial approval scheme for facilities which perform both a pollution control function and a manufacture of products function is not an unreasonable way to implement the legislature's intent to give tax credits only for moneys spent for pollution control purposes. We do not believe the legislature in enacting RCW 82.34 in-

tended to subsidize the entire cost of new manufacturing equipment which may pollute less than its predecessors.

The respondent's argument flies in the face of practical considerations which WAC 173-24 takes into account by the way in which the regulations implement the operational test of RCW 82.34. WAC 173-24 avoids what might otherwise be an inherently arbitrary, all-or-nothing operational test which would ultimately defeat the legislature's purpose in enacting RCW 82.34.

Most pollution control equipment is not in the form of "black box" or "tack on" equipment; it is in the form of newer, more modern manufacturing equipment which pollutes less. Without the objective and workable regulatory scheme embodied in WAC 173-24 for determining the "primary purpose" for which such more modern equipment is operated, there would be no tax credit at all for such equipment, and thus the legislature's purpose to encourage manufacturers to meet the pollution control standards would be impaired.

> [A] good [pollution abatement] program is normally so closely related to the production process that very few expenditures will meet either the primary purpose or the exclusive use test.
>
> . . . .
>
> Pollution problems are usually an integral part of the production process. Their control requires a plan carefully integrated into the entire operation of the business. Nearly all industrial pollution can be controlled, and effective control is best managed if the production process is designed to minimize waste.
>
> Some methods of control are to substitute fuels or power sources; substitute raw materials; use different production processes; change the design of the product; capture pollutants before they leave the plant; change disposal practices so as to encourage reclamation of waste products; and recycle either waste products or resources used in the productive process.

1 A. Reitze, Jr., *Environmental Law* ch. 1, at 77-78 (1972). This same observation is made in Reed, *Economic Incen-*

*tives for Pollution Abatement: Applying Theory to Practice*, 12 Ariz. L. Rev. 511, 530-31 (1970):

> The risk remains, however, that such statutes [with a primary purpose test] may be construed to embody an all-or-nothing approach. If a treatment works were primarily installed for the purpose of recovering commercially usable end products, and also significantly reduced waste discharge, the incentive could be denied altogether. . . . [T]he end result is undesirable because it may have the effect of discouraging the construction of abatement facilities which produce commercially usable by-products.

Therefore, we cannot agree appellant's sensible approach to implementing the clear legislative purpose of RCW 82.34 operates to "contravene the purposes and the effective implementation of the governing legislation." *Clean Air Constituency v. California State Air Resources Bd.*, 11 Cal. 3d 801, 814, 523 P.2d 617, 114 Cal. Rptr. 577 (1974).

We also believe that "ease of administration is not an 'impermissible factor' " in designing procedures to carry out appellant's delegated duty in this situation. *United States v. Boyd*, 491 F.2d 1163, 1168 (9th Cir. 1973). Appellant properly points out that because equipment changes in manufacturing plants may be made for several reasons (for example, to simultaneously modernize production *and* to meet pollution control standards) it is usually very difficult to identify the "primary" purpose for the change. We agree with appellant that there is a serious danger of arbitrary certification if the "primary" purpose test is construed to be a subjective test, rather than the objective test adopted by WAC 173-24.

[4] Although for the reasons discussed we are prepared to uphold appellant's partial approval scheme for manufacturing equipment notwithstanding the absence of express authority from RCW 82.34, this partial approval scheme finds support in the language of RCW 82.34 itself. This language appears in the statutory definition of "facility":

> "Facility" . . . includes any treatment works, control devices and disposal systems, machinery, equipment,

structures, property or *any part* or accessories thereof . . .

(Italics ours.) RCW 82.34.010(1). Appellant, in WAC 173-24, relies upon the "any part" language as a basis for its partial approval scheme for manufacturing equipment. WAC 173-24-030(3) has interpreted this statutory language to mean "any physically or conceptually identifiable part or accessories [of a facility]." WAC 173-24-030(3). We cannot say the word "part" reasonably means only a physically segregable part of a facility and not a conceptual portion. It was long ago pointed out:

> The term, "*a part*," has reference to quantity, as less than the whole, and properly construed, is not to be taken as meaning necessarily that the part excepted is in one piece or parcel. This is the usual and ordinary signification of the word; as when we say a part of Maryland is sandy, we are not to be understood as meaning that the sandy portion is to be found in one integral piece. or parcel of the State's surface.

*Carroll's Lessee v. Granite Mfg. Co.,* 11 Md. 399, 409 (1857); *see Vrooman v. Weed,* 2 Barb. 330, 333 (N.Y. 1848) ("The word *part* may as appropriately be applied to an undivided as to a divided part").

2. Respondent's second argument is that to permit a facility "necessary to the manufacture of products" to receive only partial certification (WAC 173-24-100(2)) is an improper interpretation of RCW 82.34, because the statute explicitly uses this "necessary to the manufacture of products" exclusion *only* in the definition of facilities classified as "disposal systems" and not to facilities classified as "treatment works" or "control devices." RCW 82.34.010(3)-(4). Respondent apparently contends the rule of "expresio unius est exclusio alterius" applies here to prevent a widening of this exclusion to the other classes of facilities.

Such exclusion by the legislature in the definition of facilities classified as "disposal systems" is too ambiguous an indication of legislative intent to adopt respondent's definition of RCW 82.34.010(3)-(4). We believe the over-

riding legislative intent to provide tax credit only for money spent for pollution control should determine the interpretation of any ambiguity in the statutory language.

> The rule that the expression of one thing will, under certain circumstances, exclude others, should be applied as a means of discovering the legislative intent, and its application should not be permitted to defeat the plainly indicated purpose of the legislature . . .

*State ex rel. Spokane United Rys. v. Department of Pub. Serv.*, 191 Wash. 595, 598, 71 P.2d 661 (1937); *accord, Swanson v. White*, 83 Wn.2d 175, 183, 517 P.2d 959 (1973).

It is entirely possible the language may have been placed in RCW 82.34.010(4), as appellant suggests, for another purpose. It may have been expressly included to make certain that disposal systems, which normally would be equated with pollution control functions (unlike manufacturing equipment), should not receive 100 percent certification if they are in fact necessary to the manufacture of products. Where there are two reasonable interpretations of statutory language, the interpretation which better advances the overall legislative purpose should be adopted:

> Language within a statute must be read in context with the entire statute and construed in a manner consistent with the general purposes of the statute.

*Nationwide Papers, Inc. v. Northwest Egg Sales, Inc.*, 69 Wn.2d 72, 76, 416 P.2d 687 (1966).

Respondent's third objection to WAC 173-24 stems from a provision in RCW 82.34.060(2)(b) which provides for a reduction in any tax credit to the extent commercially valuable materials are recovered by the certified facility. This, respondent contends, can mean only that the legislature intended 100 percent certification for multifunctional facilities.

This contention is subject to substantially the same objections as those applicable to respondent's second argument. We cannot say the only reasonable interpretation of the legislative purpose in including subsection .060(2)(b) is approval of 100 percent certification of facilities neces-

sary to the manufacture of products. This recapture provision, by its own terms, applies as well to reduce the tax credit for a facility which is operated *exclusively* for pollution control purposes when it also recovers valuable materials not necessary to the plant's manufacturing operations. The legislature may very well have contemplated that the current enforcement of air pollution laws in Washington will result in the recovery of many varied by-products which may be constructively utilized for profitable purposes unrelated to the manufacturing process which produced them. Examples of this "recycling" are given in 1 A. Reitze, Jr., *Environmental Law* ch. 2 (1972).

We conclude, therefore, that WAC 173-24 does not conflict with RCW 82.34. Indeed, even the Pollution Control Hearings Board noted in its memorandum opinion that WAC 173-24-030(4) and -100 are "in step with the legislative intent expressed in RCW 82.34.030."

■ The reason the board and trial court held for respondent in this case is their conclusion that Boiler #10 is, in fact, not "necessary to the manufacture of products," because it was installed only for the purpose of complying with the air pollution emission requirements of WAC 18-36.

We disagree. Boiler #10, all parties agree, performs recovery functions essential for the profitable production of kraft pulp. Accordingly, that boiler is "necessary to the manufacture of products." To be eligible for the tax exemption certificate under RCW 82.34 Boiler #10 must meet the operational test of RCW 82.34.030. Respondent cannot do this because that boiler is clearly not being operated for the "primary purpose" of pollution control. We simply are unable to find that Boiler #10, which itself is the source of the hydrogen sulfide emissions regulated by WAC 18-36, can be, in the words of RCW 82.34.030, "operated . . . primarily for the control, capture and removal of pollutants from the air . . ." *Cf.* Rev. Rul. 75-334, Int. Rev. Bull. No. 1975-32. The legislature did not intend to provide a tax exemption and tax credit for facilities to the extent they create rather than abate pollution. In addition, WAC 173-

24-030 (4) specifically classifies a facility necessary for the recovery of chemicals for use in the manufacturing process as a facility necessary to the manufacture of products, and thus eligible for partial certification only.

We conclude that inasmuch as Boiler #10 is "necessary to the manufacture of products" (WAC 173-24-100(2)), it is not entitled to 100 percent certification under RCW 82.34. We therefore remand this case to the Department of Ecology for a determination under WAC 173-24 of what part, if any, of the cost of Boiler #10 is attributable to pollution control purposes, and the issuance of a tax exemption and credit certificate for that amount.

Reversed.

STAFFORD, C.J., and FINLEY, ROSELLINI, HUNTER, HAMILTON, WRIGHT, UTTER, and BRACHTENBACH, JJ., concur.