[No. 4505–1.   Division One.   June 13, 1977.]

HENRY EICKHOFF, ET AL, *Appellants,* v. THURSTON
COUNTY, ET AL, *Respondents.*

*Ernest L. Meyer,* for appellants.

*Patrick D. Sutherland, Prosecuting Attorney, Tom Taylor, Deputy, Davies, Pearson, Anderson, Seinfeld, Gadbow, Hayes & Johnson, Ron Hayes,* and *Richard H. Benedetti,* for respondents.

CALLOW, J.—Zittel's Marina, Inc., owns and operates an existing marina on Johnson Point in Thurston County, Washington. Good fishing areas are nearby, and five state parks are on the water within 10 miles. There has been a marina at the site since 1925.

The Zittels purchased approximately 17 acres of land on Johnson Point in 1957. At that time there was a rental, launching and storage facility for 26 small boats located thereon. In 1965, the Zittels built the present facilities, which consist of a boat landing, boat launching and takeout ramp, boat removal equipment, 40 covered and 20 open moorages, and various storage houses. Mr. and Mrs. Henry Eickhoff are owners of approximately 80 acres of unimproved land lying to the south of the marina inside Baird Cove.

On October 26, 1972, Zittel's Marina, Inc., made application to Thurston County for a development permit to construct additional facilities and make other improvements to the marina. Notice was published in the legal newspaper and public hearings of the Thurston County Planning Commission were held. A draft environmental impact statement was prepared by an engineer and presented to the Thurston County Planning Staff on July 26, 1973. The staff examined the statement and made certain modifications. At the public hearings, various residents and landowners, including the Eickhoffs, were heard, and thereafter

the planning commission recommended to the county com-
missioners approval of the shorelines permit for an addi-
tional 150 moorages and other improvements, including
dockside facilities for the disposal of waste and the deep-
ening of the channel. On September 3, 1973, after two pub-
lic hearings, the Board of Thurston County Commissioners
granted a development permit. Thereafter, within the stat-
utory period, the Eickhoffs, the Department of Ecology,
and the attorney general filed a request for review of the
granting of the permit. The requests for review were con-
solidated for hearing and a hearing was held before the
Shorelines Hearings Board on February 1, 1974.

The board, by order dated March 13, 1974, remanded the
development permit granted by Thurston County back to
the county to make it more definite and certain, and on
May 6, 1974, the county issued an amended substantial
development permit to Zittel's Marina, Inc. This permit
eliminated the solid bulkhead walk which was creating a
material buildup problem, eliminated a substantial landfill
for additional parking facilities, and required that all
dredged material be removed to a deep water disposal site
under supervision of the Department of Ecology. The solid
bulkhead was to be replaced by floating walkways which
would permit the water to flow freely. In addition, a 60–foot
open space between the walkway and the shore was pro-
vided, and the number of new moorages to be allowed was
decreased from 150 to 100, which would then provide a
total wet storage capacity of 160 boats. The Department of
Ecology and the attorney general, upon this amended per-
mit, withdrew from the hearing and the proceedings before
the Shorelines Hearings Board were dismissed with preju-
dice. Exceptions to the board's findings and conclusions
concerning the admission of the Thurston County master
program were taken and the hearing was reconvened on
April 11, 1975, for the limited purpose of hearing evidence
on the Thurston County shoreline master program insofar
as it could be ascertained on the date of this permit.

The Citizen's Advisory Committee for Shoreline Management for the region began working on the shoreline master program for Thurston County on July 1, 1973. The committee held hearings throughout the county in the fall of 1973 and the proposed master program was received by the county commissioners on May 8, 1974. There was no evidence as to the master program's content or its treatment of the area in question on September 3, 1973, the date of this permit.

The Eickhoffs assert that expansion of the marina will impair the aesthetic value of their property, restrict boat access to and resident use of Baird Cove, and will have an adverse effect on the fish and shellfish in the area. They claim that the proposed new facilities would increase the negative environmental impacts, and they object to the granting of the permit claiming that allowing the existing marina to increase in size would virtually close the water access to Baird Cove.

The Shorelines Hearings Board found:

> Although the initial development of the marina in 1965 had an adverse effect on the fish and shellfish in the immediate area of the marina, the Department of Fisheries has determined that there would be little additional adverse effect at this time if expansion is permitted. The Department of Fisheries and the Thurston County Planning Department feel that close monitoring of construction by the U.S. Army Corps of Engineers, through its permit requirements, will greatly diminish the possibility of harm to the shellfish and fish in the area.

Finding of fact No. 12. The board further found:

> There is an undeniable need for additional marina facilities and moorage in Thurston County. It is also undeniable that further marina construction will have an adverse effect on the environment in terms of noise, aesthetics, and impact on marine ecology. The total adverse impact resulting from the expansion of the existing facility is considered to be less that that which would be generated by a new facility. Evidence presented at the hearing indicates that regardless of the Zittel's development, there will continue to be a substantial unmet

demand for marina and moorage facilities in Thurston County.

Finding of fact No. 14. The board affirmed the granting of the permit by order dated April 28, 1975, with three members voting for and three dissenting.

On May 15, 1975, the Eickhoffs filed a petition in Thurston County Superior Court for review of the order of the Shorelines Hearings Board, pursuant to RCW 34.04-.130. Following a trial, the court dismissed the petition with prejudice and concluded:

> The decision by the Shorelines Hearing[s] Board in affirming the issuance of the Substantial Development Permit and the action of the Thurston County Commissioners in issuing the Substantial Development Permit were based upon substantial evidence, properly considered, and were neither clearly erroneous nor arbitrary and capricious.

Conclusion of law No. 2. The Eickhoffs (hereafter referred to as "petitioners") appeal.

The issues raised on appeal are:

1. Is a 3-to-3 decision by the Shorelines Hearings Board sufficient to affirm the decision of the Board of Thurston County Commissioners?

2. Was there a proper judicial review of the Shorelines Hearings Board findings and conclusions, and did that review approve those findings and conclusions?

3. (a) Is the decision of the Shorelines Hearings Board supported by the record?

(b) Is there sufficient evidence in the record to show that environmental harm will be minimal?

4. Were the requirements of RCW 90.58.140(2), which pertain to development permits issued before the adoption of a local master program, satisfied?

5. When the permit was issued, was the Thurston County master program sufficiently developed to permit the board to ascertain whether the permit was in conformity with the program?

6. Did the Thurston County Planning Commission and Thurston County Commissioners perform their duty in representing the public interest in the issuance of this permit?

## I.

Is a 3–to–3 decision by the Shorelines Hearings Board sufficient to affirm the decision of the Board of Thurston County Commissioners?

■ The petitioners suggest that the 3–to–3 vote by the Shorelines Hearings Board did not satisfy the requirements of RCW 90.58.170. RCW 90.58.170 reads in part:

A shorelines hearings board sitting as a quasi judicial body is hereby established which shall be made up of six members: . . . A decision must be agreed to by at least four members of the board to be final.

The question was decided in *Department of Ecology v. Kirkland*, 84 Wn.2d 25, 523 P.2d 1181 (1974). In that case, the City of Kirkland had issued a substantial development permit authorizing construction of an all–weather moorage facility on Lake Washington. Review was subsequently sought before the Shorelines Hearings Board, and resulted in a vote of three in favor of the City of Kirkland's action, and three opposed. The court held: "The tie–vote board determination resulted in the decision of the City of Kirkland standing affirmed." *Department of Ecology v. Kirkland, supra* at 30. The tie vote of the Shorelines Hearings Board affirmed the action of the Board of Thurston County Commissioners.

## II.

Was there a proper judicial review of the Shorelines Hearings Board findings and conclusions and did that review approve those findings and conclusions?

■ As stated in *Hayes v. Yount*, 87 Wn.2d 280, 286, 552 P.2d 1038 (1976):

The proceedings of the Shorelines Hearings Board, a quasi–judicial body, and judicial review of its decisions

regarding shoreline development permits are governed by the administrative procedure act, RCW 34.04. RCW 90.50.170; 90.58.180(3). Its actions are to be affirmed unless the administrative findings, conclusions, or decisions are "clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or . . . arbitrary or capricious." RCW 34.04.130(6)(e), (f); *Department of Ecology v. Ballard Elks Lodge 827*, 84 Wn.2d 551, 555, 527 P.2d 1121 (1974); *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 113–14, 508 P.2d 166 (1973). Agency action is "arbitrary or capricious" if there is no support in the record for the action which is therefore *"'wilful. and unreasoning action, in disregard of facts and circumstances.'" Northern Pac. Transp. Co. v. State Util. & Transp. Comm'n*, 69 Wn.2d 472, 478, 418 P.2d 735 (1966). Under the more rigorous "clearly erroneous" standard agency action may be reversed where the reviewing court is firmly convinced that a mistake has been committed, even though there is evidence supporting the action. *Ancheta v. Daly*, 77 Wn.2d 255, 260, 461 P.2d 531 (1969). The existence of such a mistake must be considered by the court in light of the policy contained in the authorizing statute, which is made part of the standard of review by RCW 34.04.130(6)(e). *Schuffenhauer v. Department of Employment Security*, 86 Wn.2d 233, 235, 543 P.2d 343 (1975). Under neither standard may a court simply substitute its judgment for that of the agency. *Farm Supply Distribs., Inc. v. State Util. & Transp. Comm'n*, 83 Wn.2d 446, 449, 518 P.2d 1237 (1974).

Here, the trial court, after a review of the transcripts of the administrative hearings and memoranda, exhibits, and pleadings submitted to it, could not say it was firmly convinced a mistake had been made by the Shorelines Hearings Board or the Board of Thurston County Commissioners, or that the actions of either of the administrative bodies were arbitrary or capricious. The trial court had no other course but to dismiss the petition and approve the acts of the boards under the circumstances.

## III.

(a) Is the decision of the Shorelines Hearings Board supported by the record?

(b) Is there sufficient evidence in the record to show that environmental harm will be minimal?

The petitioners assert that there is no evidence in the record to support a portion of a finding of the Shorelines Hearings Board. The part objected to reads:

The total adverse impact resulting from the expansion of the existing facility is considered to be less than that which would be generated by a new facility.

Substantial evidence refutes this contention and provides a sufficient basis for the decisions of the administrative bodies and the trial court. An uncontested finding of fact of the Shorelines Hearings Board stated:

Although the initial development of the marina in 1965 had an adverse effect on the fish and shellfish in the immediate area of the marina, the Department of Fisheries has determined that there would be little additional adverse effect at this time if expansion is permitted. . . .

In addition, the Environmental Assessment Statement prepared in 1973 stated:

(I) Since the marine activity has been active and continuous at the site for many years and since the available moorage area has been completely leased for a significant time with a substantial number of requests for greater availability of these services, it is apparent that the location and services provided at this site are needed and desireable [sic]. To deny the expansion of the marina area to house and shelter water craft will essentially necessitate that some other location provide this same service. Because of the direct availability of deep and expanse [sic] water, the applicant contends that this site is as well suited, [if] in fact not better suited, than any other location in southern Puget Sound.

Further, testimony of the staff of the Thurston County Planning Commission at the July 26, 1973, meeting of that commission and their staff report both evidence the view that:

If expansion of this existing facility is denied, it may mean that a new facility will be built elsewhere. The staff feels that the total adverse impact resulting from the expansion of the existing facilities will be less than that which would be generated by a new facility.

██ The petitioners assert, however, that the "less adverse impact" standard is not a relevant consideration in the granting or denying of a substantial development permit. The policy of RCW 90.58.020 and the administrative regulations promulgated in furtherance of the statute do not support this assertion. RCW 90.58.020 states:

> [E]ver increasing pressures of additional uses are being placed on the shorelines necessitating increased coordination in the management and development of the shorelines of the state. . . .
>
> It is the policy of the state to provide for the management of the shorelines of the state by planning for and fostering all reasonable and appropriate uses. This policy is designed to insure the development of these shorelines in a manner which, while allowing for limited reduction of rights of the public in the navigable waters, will promote and enhance the public interest. This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and corollary rights incidental thereto.
>
> . . .
> In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities of natural shorelines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally. To this end uses shall be preferred which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline. *Alterations of the natural condition of the shorelines* of the state, *in those limited instances when authorized, shall be given priority* for single family residences, ports, shoreline recreational uses *including* but not limited to parks, *marinas,* piers, and other improvements facilitating public access to shorelines of the state, industrial and commercial developments which

are particularly dependent on their location on or use of the shorelines of the state and other development that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state.

*Permitted uses in the shorelines of the state shall be designed and conducted in a manner to minimize, insofar as practical,. any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water.*

(Italics ours.) WAC 173–16–060(5)(b) provides:

Marinas should be designed in a manner that *will reduce damage* to fish and shellfish resources and be *aesthetically compatible* with adjacent areas.

WAC 173–16–060(5)(d) provides:

Special attention should be given to the design and development of operational procedures for fuel handling and storage *in order to minimize* accidental spillage and provide satisfactory means for handling those spills that do occur.

WAC 173–16–060(19) provides:

(19) Piers. A pier or dock is a structure built over or floating upon the water, used as a landing place for marine transport or for recreational purposes. While floating docks generally *create less* of a visual *impact* than those on piling, they constitute an impediment to boat traffic and shoreline trolling. . . .

(a) The use of floating docks *should be encouraged* in those areas where scenic values are high and where conflicts with recreational boaters and fishermen will not be created.

(Italics ours.) The wording of these provisions prompts the administrative bodies involved to approve only those developments that impose as small an impact upon the habitat as possible. The approval of the expansion of the marina, taking into consideration that the result of approval would have less adverse impact on nature than the creation of an additional totally new marina, was a proper action.

IV.
Were the requirements of RCW 90.58.140(2)(a), which pertain to development permits issued before the adoption of a local master program, satisfied?

The petitioners contend that the issuance of this substantial development permit must be reversed because the administrative agencies did not comply with RCW 90.58.140(2)(a). This statute provides in part:

(2) No substantial development shall be undertaken on shorelines of the state without first obtaining a permit from the government entity having administrative jurisdiction under this chapter.
A permit shall be granted:
(a) From June 1, 1971 until such time as an applicable master program has become effective, only when the development proposed is consistent with: (i) The policy of RCW 90.58.020; and (ii) after their adoption, the guidelines and regulations of the department; and (iii) so far as can be ascertained, the master program being developed for the area;

The requirement that the proposed development be consistent with the general policy directives of RCW 90.58.020 was met. The statute states in part:

90.58.020 Legislative findings—State policy enunciated—Use preference. The legislature finds that the shorelines of the state are among the most valuable and fragile of its natural resources and that there is great concern throughout the state relating to their utilization, protection, restoration, and preservation. In addition it finds that ever *increasing pressures of additional uses* are being placed on the shorelines necessitating increased coordination in the management and development of the shorelines of the state. . . . There is, therefore, a clear and urgent *demand* for a *planned, rational, and concerted effort, jointly performed by federal, state, and local governments, to prevent the inherent harm* in an uncoordinated and piecemeal development of the state's shorelines.
It is the policy of the state to provide for the management of the shorelines of the state by *planning for and*

*fostering all reasonable and appropriate uses.* This policy is designed to *insure the development* of these shorelines *in a manner which,* while allowing for limited reduction of rights of the public in the navigable waters, *will promote* and *enhance* the *public interest.* This policy contemplates protecting against adverse effects to the public health, the land and its vegetation and wildlife, and the waters of the state and their aquatic life, while protecting generally public rights of navigation and cor-ollary rights incidental thereto.

. . .

In the implementation of this policy the public's opportunity to enjoy the physical and aesthetic qualities of natural shorelines of the state shall be preserved to the greatest extent feasible consistent with the overall best interest of the state and the people generally. To this end uses shall be preferred which are consistent with control of pollution and prevention of damage to the natural environment, or are unique to or dependent upon use of the state's shoreline. *Alterations of the natural condition of the shorelines* of the state, *in those limited instances when authorized, shall be given priority for* single family residences, ports, *shoreline recreational uses including* but not limited to parks, *marinas,* piers, and other improvements facilitating public access to shorelines of the state, industrial and commercial developments which are particularly dependent on their location on or use of the shorelines of the state and other development that will provide an opportunity for substantial numbers of the people to enjoy the shorelines of the state.

(Italics ours.) Although the petitioners contend the existing marina is a "nonconforming use," RCW 90.58.020 specifically lists "marinas" as a "priority" permitted alteration of the natural shoreline. The record reflects a considered effort by the permit applicant, Thurston County officials, the attorney general, the Department of Ecology, and the federal government through the Corps of Engineers, to arrive at a rational, planned solution by the coordination of activities and adjustments in the proposed development in order to permit use in a manner to minimize any resultant damage to the ecology and environment of the shoreline area and any interference with the public's use of the water.

The second requirement of RCW 90.58.140(2)(a) is coordination with the applicable regulations. The petitioners contend that the record does not indicate that these regulations were considered. We disagree. The statute mandates compliance with the appropriate guidelines and regulations. Compliance with the regulations is evident from the findings of fact and from the adjustments made in the initial permit application.

The first regulation considered by the administrative bodies was WAC 173-16-060(5)(b). This regulation provides that marinas should be designed in a manner that "will reduce damage to fish and shellfish resources and be aesthetically compatible with adjacent areas." The evidence of its being considered is shown both by the fact that a marina has been in existence on this site for 25 years, and by the finding of fact which involves the determination by the Department of Fisheries that there would be little additional adverse impact if expansion of the existing marina was permitted.

The second regulation considered was WAC 173-16-060(5)(c). This regulation provides:

> Master programs should identify locations that are near high-use or potentially high-use areas for proposed marina sites.

An unchallenged finding of fact establishes that "two of the better salmon fishing areas in southern Puget Sound" are located near the site of the proposed expanded marina. This establishes the location as a "high-use" area and meets the requirement of the regulation.

Other regulations implicitly considered are WAC 173-16-060(5)(e) and (16)(a). These regulations provide:

> Shallow-water embayments with poor flushing action should not be considered for overnight and long-term moorage facilities.

WAC 173-16-060(5)(e).

> Local governments should control dredging to minimize damage to existing ecological values and natural

resources of both the area to be dredged and the area for deposit of dredged materials. WAC 173–16–060(16)(a). These regulations were satisfied by dredging the shallow areas and requiring supervision of the dredging by the Corps of Engineers.

## V.

When the permit was issued, was the Thurston County master program sufficiently developed to permit the board to ascertain whether the permit was in conformity with the program?

The last provision of RCW 90.58.140(2)(a) requires that a proposed development be consistent with, "*so far as can be ascertained, the master program being developed* for the area". (Italics ours.) This section provides for situations where the issuance of a permit is being considered without the benefit of policy guidance from an established master program. This section is followed by RCW 90.58.140(2)(b), concerning the issuance of permits *after* adoption or approval of a master program. The two sections should be construed together in order that permits will be issued for substantial developments only when the proposed work will be consistent with provisions in a master program still coming into being even though such master program has not been formally adopted and approved. The test is whether the master program's provisions were reasonably ascertainable, *not* whether the master program was formally adopted or approved.

In this instance, the initial draft of the proposed shoreline master program had not been received by the Board of Thurston County Commissioners prior to September 3, 1973, when the first permit was issued. Nor was any tentative master program available prior to the issuance of the revised, more detailed permit on May 6, 1974. It was not until 2 days later, on May 8, 1974, that the Board of Thurston County Commissioners first received a draft of a proposed master program. Given (1) the "embryonic stage"

of the Thurston County master program during the consideration of this permit, and (2) the action taken by the administrative bodies involved in remanding the initial permit for more specificity, thereby facilitating negotiation and compromise among the interested parties, there was a bona fide effort to design a specific project that was not inconsistent with either the general policy guidelines of the Shoreline Management Act of 1971, or the future development of a shorelines master program for the area, as far as it could be reasonably ascertained.

■ The Shorelines Hearings Board has interpreted the "so far as can be ascertained" language to require evidence of a more developed master program than the petitioners were able to show here. *See* Washington State Environmental Reporter, Shorelines Hearings Board No. 201, July 15, 1976. This interpretation by the Shorelines Hearings Board of an ambiguous statutory provision is entitled to great weight. *Weyerhaeuser Co. v. Department of Ecology*, 86 Wn.2d 310, 315, 545 P.2d 5 (1976); *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975). The Shorelines Hearings Board decision that the specific provisions of the master program involved here were not yet ascertainable at the time of the granting of the revised permit is supported by the evidence before us.

## VI.

Did the Thurston County Planning Commission and Thurston County commissioners perform their duty in representing the public interest in the issuance of this permit?

Finally, the petitioners contend that the Board of Thurston County Commissioners and the Thurston County Planning Commission have abrogated their responsibilities by (1) not representing the public interest, and (2) by granting this permit while failing to develop plans for the proper location of marinas. The record does not support these assertions.

■ The Shoreline Management Act of 1971 provides that its provisions are to "be liberally construed to give full effect to the objectives and purposes for which it was enacted." RCW 90.58.900. *See Hayes v. Yount,* 87 Wn.2d 280, 289, 552 P.2d 1038 (1976); *Hama Hama Co. v. Shorelines Hearings Bd., supra* at 446. Substantive compliance with the act must prevail over technical objections. Here, the administrative bodies involved provided notice of public hearings on consideration of this permit, conducted the hearings in a fair manner, considered alternatives including the no–project alternative, and heard evidence for and against the issuance of the permit. All parties agree that this is so. In addition, the Thurston County officials visited the site in person in their official capacity and invited response to their draft environmental impact statement from the United States Environmental Protection Agency, the Thurston–Mason Health District, the Bureau of Sport Fisheries, the Ecological Commission, the Olympia Oyster Growers Association, and the State Departments of Game, Fisheries, Natural Resources, and Ecology. This was sufficient compliance with the statutory directive that they represent and protect the public interest.

The Shoreline Management Act of 1971 was intended to enhance ordered, advantageous and environmentally sound development, not prohibit it. *Department of Ecology v. Ballard Elks Lodge 827,* 84 Wn.2d 551, 527 P.2d 1121 (1974). The trial court found that the administrative bodies concerned had conducted their proceedings with this objective in mind and had weighed the evidence for and against the issuing of the permit.

We do not find that a "mistake" has been made or that the decisions of the agencies have been "clearly erroneous." We do not find evidence of "willful and unreasoning action, in disregard of facts and circumstances."

The judgment is affirmed.

FARRIS, C.J., and WILLIAMS, J., concur.