[Nos. 9294–1–III; 9364–6–III.   Division Three.   April 13, 1989.]

DANIEL A. NEWLUN, *Respondent,* v. THE DEPARTMENT OF RETIREMENT SYSTEMS, ET AL, *Appellants.*

Kenneth O. Eikenberry, Attorney General, and *Ceil Buddeke* and *Stewart A. Estes, Assistants; James C. Sloane, City Attorney,* and *Rocco N. Treppiedi, Assistant; Meriwether D. Williams* and *Winston & Cashatt,* for appellants.

*Gregory G. Staeheli, David A. Saraceno,* and *Kain & Snow,* for respondent.

THOMPSON, C.J.—The City of Spokane and the State of Washington, Department of Retirement Systems, appealed a summary judgment in favor of former Spokane Police Detective Daniel Newlun. The summary judgment was entered in favor of Mr. Newlun on his petition for review of a decision by the Director of Retirement Systems denying him a disability pension under the Law Enforcement Officers' and Fire Fighters' Act (LEOFFA), RCW 41.26. The Director's decision, based solely on jurisdictional grounds, held the Department had no authority to pay Mr. Newlun a pension because, at his request, it had already mailed a warrant to him refunding his retirement contributions.

RCW 41.26.170.[1] The City and the Department also appealed a court order awarding Mr. Newlun benefits pending further review in this court.[2]

After oral argument and without deciding the issues presented, we remanded to the Director for entry of findings on whether Mr. Newlun was disabled. RCW 34.04.120.[3] We retained jurisdiction pursuant to RAP 8.3 and 12.2.[4] The Director found Mr. Newlun was not disabled. Mr. Newlun then filed a petition for review of that decision in superior court. The Superior Court certified this petition to us and we have consolidated the petition with the earlier appeals.[5]

---

[1]RCW 41.26.170:

"(1) Should service of a member be discontinued except by death, disability or retirement, he shall, upon application therefor, be paid his accumulated contributions within sixty days after the date of application and his rights to all benefits as a member shall cease: . . ."

[2]Mr. Newlun also cross–appealed from the Superior Court's decision to limit the record on its review to only those portions relating to jurisdiction. In light of the holdings of this opinion, we need not address the cross appeal and Mr. Newlun's argument that the Director was barred by collateral estoppel from reaching a conclusion different from that of the administrative officers who had heard the case before it reached him.

[3]RCW 34.04.120 specifically states:

"Every decision and order adverse to a party to the proceeding, rendered by an agency in a contested case, shall be in writing or stated in the record and *shall be accompanied by findings of fact and conclusions of law. The findings of fact shall consist of a concise statement of each fact found upon each contested issue of fact.*" (Italics ours.)

[4]Under RAP 8.3:

"Except when prohibited by statute, the appellate court has authority to issue orders, before or after acceptance of review, *to insure effective and equitable review* . . ." (Italics ours.)

RAP 12.2 provides:

"The appellate court may reverse, affirm, or modify the decision being reviewed and *take any other action as the merits of the case and the interest of justice may require.*" (Italics ours.)

[5]The conditions for certification set out in RCW 34.04.133 were satisfied.

We affirm the Superior Court's summary judgment holding the Department had jurisdiction to consider Mr. Newlun's application for a disability pension. We reverse the Director's determination that Mr. Newlun was not disabled.

Mr. Newlun began his career as a police officer in Spokane in 1973. In 1981, the Spokane Police Department promoted him to the rank of detective. In January 1982, Mr. Newlun began undercover work with the special investigations division, and in October 1983, the division assigned him to investigate narcotics. At the time, the police department had no written policy regarding the use of drugs by undercover officers. As part of his work, Mr. Newlun used cocaine, and reported this fact in his investigative reports.

In July 1985, Mr. Newlun "freebased" cocaine during an investigation. In freebasing, the drug user smokes a pure form of the narcotic, rather than inhaling a diluted, powdered form through his nose. Mr. Newlun stated that before he knew it, cocaine "was an obsession". His use of the drug escalated, he began fantasizing about it all the time, and he stole for his own use cocaine that had been seized as evidence. In February 1986, he sought professional help from Dr. Mark Mays, a psychologist.

Dr. Mays referred Mr. Newlun to Sierra Tucson, an inpatient drug treatment program in Arizona. While on disability leave from the police department, he successfully completed that program and returned to Spokane in early April. In a letter dated May 7, 1986, to special counsel to the Board of Trustees of the Spokane Police Relief and Pension Fund, Dr. George Nash of Sierra Tucson stated: "I defer any decision regarding [Mr. Newlun's] return to duty date to the professional currently treating him." The treating psychologist, Dr. Mays, was of the opinion it was not advisable to return Mr. Newlun to work right away. Nevertheless, the local disability board unconditionally returned him to work. The Spokane Police Department then placed Mr. Newlun on administrative leave.

On June 17, 1986, at the police department's request, psychologist John Berberich met with Mr. Newlun. Dr. Berberich reported:

> It is my impression that Detective Newlun is currently psychologically disabled and should not be returned to any Law Enforcement duties. Specifically, he is seriously depressed and is terribly anxious. His ability to focus his concentration, to remember, to react appropriately to interpersonal situations, to deal with confrontation of a type so commonly involved in Law Enforcement work—his psychological functioning in general—is currently undercut. *He is definitely not able to perform the duties of a Police Detective or a Police Officer with average proficiency.*
>
> . . . [T]his is *not* a permanent condition. . . . Once things are resolved in his life, I expect his psychological functioning to improve. *However, I do not know whether he could ever return to full time Police work.*

(Italics ours.) In a second letter dated July 8, 1986, and directed to Greg Staeheli, Mr. Newlun's counsel, Dr. Berberich stated:

> Returning him to work prior to the time that he would be able to return is folly. *Dr. Mays should give you direction in that regard.*

(Italics ours.)

About this same time, Mr. Newlun met with the chief of police who told him the police department had no job for him and that he had lost all credibility. On June 19, 1986, Mr. Newlun resigned from the police force and on that same day filled out and submitted a form entitled "Request for Refund of Contributions" in which he sought return of his contributions to the LEOFF system. The form contained the following two statements:

> If you should decide to remain a member of your system after you receive the refund, the check may be returned uncashed within a reasonable time and the amount will be credited to your account together with the service credit it represented.
>
> . . .

. . . I understand that even a partial withdrawal nullifies any claim or right that I have to benefits which may have accrued to me as a member of that system.

Then, on July 3, 1986, Mr. Newlun applied for a disability pension.

In denying Mr. Newlun's request for a pension, the Director of the Department of Retirement Systems relied on the events following the July 3 application. On July 23, 1986, Mr. Newlun wrote to the Department:

I had sent you paper work requesting my contribution to the pension fund when I resigned in June 86. The request was then held up pending negotiations with the Pension Board in Spokane. I have decided to cancel any further negotiations and I am requesting my contribution funds as soon as possible. I understand this means I am not entitled to any benefits from the Pension act.

On August 8, 1986, the Department sent Mr. Newlun a warrant refunding his contributions to the pension fund. The cover letter was signed by Robert L. Hollister, Jr., Director of Retirement Systems, and concluded: "In summary, once you cash the warrant, there is no further recourse unless you return to covered employment." Mr. Newlun did not cash the warrant. He returned it to the Department on October 27, 1986.

Earlier in October, the Board of Trustees of the Spokane Police Relief and Pension Fund conducted a hearing to consider Mr. Newlun's application for disability retirement. Testimony and documentary evidence was received from Dr. Mays, Dr. Paul Purchard, a psychiatrist, and Dr. Gregory Nail, a physician; the latter two examined Mr. Newlun at the board's request. All three medical experts stated Mr. Newlun was permanently disabled from work as a Spokane police officer.

Dr. Mays stated:

You have provided me with a description of his work, and I note that the formal job description for a detective requires "more than the normal degree of concentration." Additionally, it requires "regular public contact requiring

a high degree of tact, judgment and technical knowledge." I think that Mr. Newlun does not have even his normal level of concentration and attention. I think the acute stresses, the sensitivity, shame and embarrassment about his circumstances and the stigma attached all result in him being less effective in his interpersonal relationships.

. . . I do not think that he would ever be able to return to work in the Spokane Police Department, I think this would always pose a particular stress for him, and think it is very unlikely that he would be able to function well as a [police] officer, at all.

Dr. Purchard also was of the opinion that Mr. Newlun could not perform the duties of detective:

Mr. Newlun requires support systems to function, to avoid symptoms such as depression, anxiety, inability to concentrate and to refrain from drug usage.

Job pride and satisfaction was his bastion. His peer group, which is the most important, has characteristically much disdain for him as a cocaine addict. He is generally isolated from them. His department is, to say the least, unhappy with his situation. He feels that they subtly, strongly encouraged him to resign. The public has read the newspaper articles making him notorious and compromising his credibility. His credibility in court has been compromised.

His inability to concentrate, especially when he is depressed, anxious or in a low self–esteem position would compromise his ability to supervise uniformed officers assigned to assist on a specific case or investigation. It would also compromise his court appearances. In addition he would have to sweat out his addiction background in any court cases in which he might have to testify. His cooperation with other law enforcement agencies may well also be compromised, due to his notoriety as an "illegal" drug user and skimmer of evidence.

I believe his "regular public contact requiring a high degree of tact and judgment" would be jeopardized by the stress and would increase the likelihood of his becoming repeatedly addicted.

I believe he cannot function under these conditions as a detective, in specific, and as a sworn officer, in general, for the Spokane Police Department.

. . .
It is my opinion that he will not be able to return to sworn police duty at the Spokane Police Department as a sworn law enforcement officer.

Dr. Nail wrote:

Regarding Dan's ability to return to his job as a police detective it is important to consider the issue of cocaine addiction, and particularly, with regard to law enforcement work. Cocaine has been found to be the most addictive substance known to man, and cocaine addiction is considered a life–long addiction. A reformed cocaine addict will struggle with his addiction for the rest of his life. This has been studied extensively in other metropolitan areas with regard to law enforcement officers and addiction to controlled substances, and in every experience, rehabilitation potential has been considered very low.

I have studied the psychological and psychiatric evaluations done on Dan Newlun by Drs. Purchard, Mays and Berberich.

Based on my examination of Dan Newlun, and the psychiatric evaluations provided to me, my impressions are as follows:

1. Dan Newlun is physically capable of performing the duties of a police detective with average proficiency.

2. *Dan Newlun is psychologically not capable of performing the duties of a Police Officer, First Class, or a Police Detective with average proficiency. In addition, I feel this disability is permanent.*

(Italics ours.)

On October 23, the board issued findings of fact, conclusions of law, decision and order in favor of Mr. Newlun's application for disability retirement.

On December 31, 1986, the assistant director of the Department of Retirement Systems reversed the local board's decision, pursuant to the Department's authority under RCW 41.26.120(3).[6] He reasoned:

---

[6]That statute provides that the local board's decision is subject to the approval of the Director.

Here, Newlun's cocain[e] addiction—the alleged disabling condition—was in remission prior to his discontinuance of service on 6/19/86.

Further, the statute, in unmistakable terms, speaks to a current disability, *not* one that might occur or recur in the future. There is a critical distinction between "unable to continue service", which is the condition stated in the act, and "shouldn't continue service because of the possibility of a recurrence of a previous illness or disease."

. . . [T]he *possibility* of a future relapse of remission from drug abuse does not entitle Newlun to a grant of disability retirement.

The assistant director also found Mr. Newlun was not entitled to disability benefits because he had applied for and received a refund of his accumulated contributions to the LEOFF system.

Pursuant to the procedure set forth in RCW 41.26.210, Mr. Newlun filed a notice for hearing and in April and May 1987, an administrative law judge conducted a de novo review in conformance with the provisions of the administrative procedure act, RCW 34.04. RCW 41.26.220. The administrative law judge considered the transcript and exhibits of the local board's hearing and heard testimony from several witnesses, including Dr. Mays and Michael Myhre, a sergeant in the Spokane Sheriff's Department who had worked undercover with Mr. Newlun in early 1986. Sergeant Myhre testified that Mr. Newlun had not appeared depressed, exhausted or anxious. To the contrary, Sergeant Myhre recalled they played cards while waiting for calls and that Mr. Newlun was a "real good" spades player who had no trouble concentrating.

On July 29, 1987, the administrative law judge entered proposed findings, conclusions and order in Mr. Newlun's favor. He held Mr. Newlun was not disqualified from seeking benefits by his resignation from the police department, as urged by the City, or by his request for a refund of his contributions, as urged by the Department. On the issue of Mr. Newlun's disability, the administrative law judge found: "The experts are essentially in agreement, and there

exist no substantive differences in their conclusions, when those conclusions are viewed in their complete context. Further, the conclusions are uncontroverted." Based on the medical evidence, the judge concluded: Mr. Newlun was mentally disabled; his disability rendered him unable to discharge with average efficiency the duties and responsibilities of a police detective for the City of Spokane; and the disability had been continuous since Mr. Newlun's resignation. Specifically, he noted that "[a]t the appeal hearing on April 23, 1987, Dr. Mays testified that his opinion of the Applicant's mental condition had not changed, and had perhaps worsened, since his July 10, 1986 report." The administrative law judge also directly addressed the Department's contention that the possibility of relapse does not render Mr. Newlun incapable of performing the duties of detective:

[T]he medical evidence in this case goes substantially further. The evidence establishes, in addition to the very likely possibility of relapse, that the Applicant is not capable mentally of performing with average efficiency.

On December 17, 1987, the Director rejected these proposed findings and conclusions. This decision was based solely on the Director's determination that under RCW 41.26.170, the Department lacked jurisdiction to award Mr. Newlun a pension since he had withdrawn his contributions to the pension fund.

Mr. Newlun petitioned the Superior Court to review the Director's decision. RCW 34.04.130(2). The court held (1) a person remains a member of the LEOFF system until his contributions are "paid", (2) a member is not "paid" until he cashes his refund check, (3) a person's resignation from employment as a law enforcement officer does not terminate his status as a member of the LEOFF system, and (4) a member may apply for disability retirement benefits within 1 year from the date of his discontinuance of service. Thus, it entered summary judgment in Mr. Newlun's favor. The court also ordered the Department to pay Mr. Newlun benefits pending appeal. The Department and the City

appealed both of these decisions, and this court heard argument thereon in November 1988.

After oral argument, and without filing an opinion on the jurisdiction and benefits issues, we remanded the cause to the Director for the entry of findings on the issue of whether Mr. Newlun was disabled. On December 9, 1988, the Director entered findings and conclusions that Mr. Newlun had not met his burden of proving by a preponderance of the evidence that he is unable to perform the ordinary duties of the position of detective of the Spokane Police Department with average efficiency. His decision, like that of the assistant director's in 1986, makes a distinction between "unable to continue his service" and "shouldn't continue his service because of the possibility of the recurrence of a previous illness," the latter being too speculative to render him presently incapable of performing the duties of detective.

## A

### The Appeals From the Summary Judgment

█ In reviewing an administrative decision, the appellate court is in the same position as the superior court. *Macey v. Department of Empl. Sec.*, 110 Wn.2d 308, 312, 752 P.2d 372 (1988) (citing *Farm Supply Distribs., Inc. v. State Utils. & Transp. Comm'n*, 83 Wn.2d 446, 448, 518 P.2d 1237 (1974)). Here, the appeals by the City and the Department present issues of law which are reviewed under the error of law standard of RCW 34.04.130(6)(d). Under that standard, the reviewing court may substitute its judgment for that of the administrative body, although substantial weight is accorded the agency's view of the law if it falls within the agency's special field of expertise. *Macey,* at 313; *Franklin Cy. Sheriff's Office v. Sellers,* 97 Wn.2d 317, 325, 646 P.2d 113 (1982), *cert. denied,* 459 U.S. 1106 (1983).

The City contends that when Mr. Newlun resigned, he gave up any right he may have had to a disability pension. It relied on RCW 41.26.120 which provides "[a]ny *member* . . . may be retired . . . for any disability incurred in the

line of duty . . ." (italics ours), and on the statutory definition of "member" which is limited to full–time fully compensated law enforcement officers. RCW 41.26.030(3), and (8). However, RCW 41.26.030 states the definitions set forth there apply only if a different meaning is not "plainly required by the context".

Here, the definition of "member" contained in RCW 41.26.030 is inconsistent with the proviso to RCW 41.26-.120, which reads:

(1) Any member who believes he is or is believed to be physically or mentally disabled shall be examined by such medical authority as the disability board shall employ, upon application of said member, or a person acting in his behalf, stating that said member is disabled, either physically or mentally: *Provided, That no such application shall be considered unless said member . . . shall have filed the application within a period of one year from and after the discontinuance of service of said member.*

(Italics ours.) According to the City, "discontinuance of service" refers to a situation in which a person is not reporting to work because he is on disability leave or is using his accrued sick leave or vacation leave. However, RCW 41.26.030(14)(a) defines "service" as including "all periods of employment . . . for which compensation is paid . . ." One on leave receives compensation. *See* RCW 41.26-.120. Thus, "discontinuance of service" refers to a situation in which a person has terminated his employment, not merely taken leave.

Furthermore, the City's argument is inconsistent with *State ex rel. Johnson v. Funkhouser,* 52 Wn.2d 370, 372–73, 325 P.2d 297 (1958), which held:

The only statutory condition precedent to the allowance of the disability benefits is the *fact* of disablement resulting from the performance of police duties. . . .

An application for a disability pension serves only as the means by which the right is brought before the pension tribunal . . . When one's contract of employment includes service connected disability rights, *those rights become vested at the instant the employee is injured* in

the course of his employment. The statute does not require that application for disability benefits must be made while the applicant is a member of the police department.

(Italics ours.) The court held that Mr. Johnson, who had been dismissed from the police department for misconduct, could apply for a disability pension for a service–connected injury. *See also Knudson v. Ellensburg,* 832 F.2d 1142, 1146 (9th Cir. 1987), which cited *Funkhouser* favorably.

The City asserts *Funkhouser* is distinguishable because it was decided under RCW 41.20.060, a section of the pension act which preceded the LEOFF system. Unlike RCW 41.26.120, which uses the term "member", RCW 41.20.060 reads: "Whenever any *person,* while serving as a policeman . . . becomes incapacitated . . ., the board may . . . retire such person from the department . . ." (Italics ours.) Instead, the City relies on *Pleuss v. Seattle,* 8 Wn. App. 133, 139, 504 P.2d 1191 (1972), which held a fireman who had resigned did not have a right to a disability pension.

We do not find *Pleuss* persuasive. The statute there, RCW 41.18, does not contain the 1–year window period of RCW 41.26.120. Moreover, *Pleuss* cites a 1970 Illinois case as authority, *Freberg v. Board of Trustees of Firemen's Pension Fund,* 128 Ill. App. 2d 369, 262 N.E.2d 22 (1970). *Pleuss* does not cite *Funkhouser,* nor does it mention *Bakenhus v. Seattle,* 48 Wn.2d 695, 296 P.2d 536 (1956), a case upon which *Funkhouser* relied. In interpreting the police pension act, *Bakenhus* rejected cases from jurisdictions which do not recognize the contractual nature of the public employer's obligation to an employee who has fulfilled all the prescribed conditions for a pension. *Bakenhus,* at 698. Illinois, in contrast to Washington, has held its statute providing for a police pension is *not* in the nature of a contract. *Blough v. Ekstrom,* 14 Ill. App. 2d 153, 144 N.E.2d 436, 439–40 (1957).

*Bakenhus* cited California as a state in which provisions of the pension statute are deemed part of the employment contract. In *Holt v. Board of Police & Fire Pension*

*Comm'rs,* 86 Cal. App. 2d 714, 716, 196 P.2d 94, 96 (1948), the court held that "an injured police officer cannot be deprived of his right to a pension merely because he first resigned from the police force and then filed application therefor". *Holt*'s rational is that the officer's right to a pension vests when he becomes disabled, and he is not divested of the right merely by the act of resigning. The statute in *Holt,* like RCW 41.26.120, referred to a "member" who became physically disabled.

*Miller v. Wilmington,* 285 A.2d 443 (Del. Ch. 1971), *aff'd,* 293 A.2d 574 (Del. 1972), *abandoned in part on other grounds in Wilmington v. Williams,* 399 A.2d 203 (Del. 1979), also concerned a policeman who first resigned, then filed for a disability pension. In response to an argument by the City of Wilmington similar to the City of Spokane's argument here, the court stated:

> Section 20–7 of the Wilmington Code establishes a procedure for granting disability pension where a member of the Department files an application for retirement on a disability pension. . . .
> The ordinance does not by its terms preclude the application of one not a member of the Department, and should not be so construed as that construction would prevent the application of an employee who has been wrongfully discharged subsequent to a work–related injury. . . .
> A primary purpose of the statute is to provide compensation to police officers for permanent disabilities which they receive in the course of their official duties. The right to a pension does not, therefore, depend on the applicant's status when applying, but rather on fulfillment of the statutory requirements for eligibility. . . .
> Defendants contend, however, that plaintiff has waived his right to a pension since he voluntarily resigned . . . Defendants' argument fails to consider the liberal rules of construction established by the courts of this state in construing pension statutes. Because of the remedial purpose of such statutes . . . a forfeiture or waiver of pension rights should be found only where clearly intended by the parties.

*Miller,* 285 A.2d at 445–46.

■ Finally, the City points out that RCW 41.26.170, as originally enacted by Laws of 1969, 1st Ex. Sess., ch. 209, § 22(1) read:

Should service of a member be discontinued except by death, disability or retirement, within six months after the day of discontinuance, he shall be paid his accumulated contributions, and his rights to all benefits as a member shall cease without notice. *The provisions of this section shall be inapplicable to a member who leaves the service and is later found to have left the service by reason of disability*: . . .

(Italics ours.) The Legislature deleted the italicized portion of RCW 41.26.170 in Laws of 1970, 1st Ex. Sess., ch. 6, § 14. The City claims the deletion is evidence of the Legislature's intent that persons who resign lose their right to benefits. We disagree. When read in the context of the rest of RCW 41.26.170, the deletion is evidence only of an intent that persons who have terminated employment *and also* have been paid their accumulated contribution have no further rights.

We hold that under RCW 41.26.120, a person has 1 year after he resigns from the police department to apply for disability retirement for a service–related disability. That right is waived only if the person requests and is paid a refund of his contributions.

This holding leads us to the Department's assertion that Mr. Newlun was "paid" his accumulated contributions within the meaning of RCW 41.26.170. That statute provides:

(1) Should service of a member be discontinued except by death, disability or retirement, he shall, upon application therefor, be *paid* his accumulated contributions within sixty days after the day of application and his rights to all benefits as a member shall cease: . . .

(Italics ours.) As noted, both the form which Mr. Newlun filled out to request a refund of his contributions and the letter from the Director accompanying the refund warrant advised him that he lost all claims by *cashing* the warrant. Yet the Director, in rejecting the proposed decision of the

administrative law judge, relied on WAC 415–02–060. That regulation provides in part: "A member may cancel the request for a refund of accumulated contributions at any time prior to the *mailing* of the warrant representing the refund of contributions." (Italics ours.)

The Superior Court rejected the Department's reliance upon this regulation. While the court noted that administrative interpretations of agency enabling statutes and rules are entitled to great weight,[7] it also pointed out that the "administrative interpretation" provided by the Director to Mr. Newlun in his letter was inconsistent with the WAC. It asked: "[W]hat great weight should I give to [the Director's] statement, as opposed to the WAC, which is what he is presumably relying on, at this point?" In addition, WAC 415–02–030 does not list RCW 41.26 as one of the retirement systems to which the WAC chapter applies. The omission may have been a typographical error; however, it further clouds the authority of the WAC provision as applied to RCW 41.26.

In any event, WAC 415–02–060 is not in harmony with the intent and purpose of LEOFFA.[8] In RCW 41.26-.170, the Legislature established that one who is "paid" his contributions forgoes his right to benefits, but it did not define "paid". In construing its meaning, we consider the subject matter involved, the context of the word, and the purpose of the statute.[9] *PUD 1 v. WPPSS*, 104 Wn.2d 353, 369, 705 P.2d 1195, 713 P.2d 1109 (1985). The apparent

---

[7]*Cosro, Inc. v. Liquor Control Bd.*, 107 Wn.2d 754, 757, 733 P.2d 539 (1987); *Geiger v. Department of Retirement Sys.*, 43 Wn. App. 86, 91, 715 P.2d 523, *review denied*, 105 Wn.2d 1021 (1986); *Vliet v. Department of Labor & Indus.*, 30 Wn. App. 709, 713, 638 P.2d 112 (1981), *review denied*, 97 Wn.2d 1002 (1982).

[8]Regulations are entitled to considerable weight only if they are consistent with the intent and purpose of the Legislature. *Weyerhaeuser Co. v. Department of Ecology*, 86 Wn.2d 310, 317, 545 P.2d 5 (1976).

[9]*See Johnson v. Department of Empl. Sec.*, 112 Wn.2d 172, 769 P.2d 305 (1989) in which the Supreme Court cited the policy behind the Employment Security Act, RCW 50.04, as authority supporting its construction of the word "payment" as used in RCW 50.04.323.

purpose of RCW 41.26.170 is to keep the LEOFF system actuarially sound. *I.e.*, the LEOFF system cannot operate if it is subject to claims by persons who have withdrawn their moneys from use by the system. An interpretation of "paid" as not occurring until the member cashes his warrant is consistent with this purpose. Specifically, until the member actually receives cash for his contributions, the LEOFF system is not affected. The mere drawing of the warrant does not remove the contributions from the LEOFF reserve pool. Moreover, this construction is appropriate, given the remedial character of pension statutes, which the courts of this state liberally construe in favor of the intended beneficiary. *Hanson v. Seattle*, 80 Wn.2d 242, 247, 493 P.2d 775 (1972).[10] Thus, we hold "paid", as used in RCW 41.26.170, means when the member cashes the warrant.[11]

Since Mr. Newlun did not cash the warrant, jurisdiction existed in the Department to consider his request for disability retirement. We therefore affirm the Superior Court's summary judgment reversing the Director's decision on this issue.

## B
### THE PETITION FOR REVIEW

■ We must next determine whether the Director's decision that Mr. Newlun was not disabled is arbitrary and

---

[10]The Department contends that the policy of liberal construction does not apply to defining *which persons come within the act's terms*. *Automobile Drivers & Demonstrators Local 882 v. Department of Retirement Sys.*, 92 Wn.2d 415, 418, 598 P.2d 379 (1979) (police officers of a port district do not come within definition of law enforcement officer contained in LEOFFA), *cert. denied*, 44 U.S. 1040, 62 L. Ed. 2d 726, 100 S. Ct. 724 (1980). *Berry v. Department of Labor & Indus.*, 45 Wn. App. 883, 884–85, 729 P.2d 63 (1986) (a partner is excluded from industrial insurance coverage unless he expressly requests coverage as a worker). But here, there is no question that Mr. Newlun was a law enforcement officer and within the class of persons LEOFFA was designed to protect.

[11]We are not swayed from our analysis by the Department's argument that this construction of "paid" allows a member to hold a check and apply for benefits at a much later date. RCW 41.26.120 provides a 1–year cutoff period for applications.

capricious or clearly erroneous. RCW 34.04.130(6)(e), (f); RCW 41.26.220; *Keever v. Law Enforcement Officers' & Fire Fighters' Retirement Bd.*, 34 Wn. App. 873, 876, 664 P.2d 1256 (1983). Under these standards, we will reverse the Director's decision only if it is willful and unreasoning or, after reviewing all the evidence in light of the policy of LEOFFA, we are "left with the definite and firm conviction that a mistake has been committed.'" *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983).

RCW 41.26.120 states:

[a]ny member . . . may be retired by the disability board, . . . for any disability incurred in the line of duty *which has been continuous since his discontinuance of service and which renders him unable to continue his service.* No disability retirement allowance shall be paid until the expiration of a period of six months after the discontinuance of service . . .

(Italics ours.) WAC 415–105–060 provides:

(2) In order to qualify to receive a disability retirement allowance, the applicant will be required to prove that he or she is physically or mentally disabled to such extent that *he or she is unable to discharge with average efficiency the duty of the position held at time of discontinuance of service:* . . .

*See also Boyles v. Department of Retirement Sys.*, 105 Wn.2d 499, 505, 716 P.2d 869 (1986) (citing *Clark v. Board of Police Pension Fund Comm'rs*, 189 Wash. 555, 66 P.2d 307 (1937)); *Keever*, at 876–77.

Here, the job description for a detective with the City of Spokane includes the following duties and responsibilities:

Nature of work:
. . . Duties require analyzing facts to determine proper action within limits of standard procedure. Employee has regular public contact requiring a high degree of tact, judgment and technical knowledge. Work . . . is performed . . . under occasional hazardous conditions, and occasionally requires more than the normal degree of concentration. . . .

Supervision:
Employee follows established procedures exercising judgment as to specific method; plans and arranges his own work referring only unusual problems to the supervisor. May occasionally supervise uniformed officers . . .
Examples of work: . . .

. . .
Gathers and analyzes evidence; makes detailed written reports of the results of investigations; composes correspondence as required concerning assigned cases.
Prepares evidence for presentation in court and testifies as to such evidence.
Requirements of work:

. . .
Ability to obtain information through interviews, investigations, interrogations and observation.
Ability to understand and execute difficult oral and written instructions; to prepare clear and comprehensive reports.
Ability to remember names, faces, and details of incidents.

We have reviewed the record, and we are left with the firm conviction that the Director committed a mistake when he determined Mr. Newlun had not proved he was disabled under LEOFFA. The uncontroverted testimony, as set out above, is that Mr. Newlun is mentally disabled, cannot perform the duties listed in his job description, and that this condition existed at the time of his discontinuance of service and is permanent.[12] The testimony was that the disability amounted to more than a "possibility of relapse". On the contrary, the medical experts agreed that the stress and shame resulting from his addiction affected his ability to concentrate, to make judgments, to testify in court, and to work effectively with others. They agreed that these skills, all of which are necessary to the performance of the position of detective, were affected to such an extent that

---

[12]The Department argues there is a distinction between a "permanent" and a "continuous" disability, but it does not say what that distinction is. We have reviewed the testimony and it establishes that Mr. Newlun's psychological disability has been continuous since his resignation.

Mr. Newlun could not discharge his duties with average efficiency. The experts' testimony is what distinguishes this case from *Clark* and *Rauch v. Fisher,* 39 Wn. App. 910, 696 P.2d 623 (1985), in which the evidence established that the applicants could and did perform at average efficiency even though they suffered some incapacity.

The Department relies on the testimony of Sergeant Myhre, cited above, and of Officer Pat Henry and Lieutenant Lynn Howerton, who appeared at the local board hearing. None of the three noticed any changes in Mr. Newlun's performance in early 1986, prior to his acknowledgement of involvement with cocaine. The Department also cites the testimony of Mr. Newlun himself that he had no problem performing his job during this time period. Dr. Purchard's statements before the local board qualify the impressions of Mr. Newlun and others regarding his job performance:

> Mr. Kingen: Well, if Dan Newlun were to tell you that, at least up until the time when he took the treatment for his cocaine addiction, that he felt like he was better—like he was performing better than he'd ever performed before on the job. Would that have anything to do with this level of functioning?
>
> Dr. Purchard: I would believe that he believes it, because the grandiosity, the euphoria, is (inaudible) for cocaine and the overestimation of themself (themselves)—would that be inconsistent? I would believe that he might believe that. Now, I don't think he told me that but—let's say that he did, going along with that—but I think he might believe that; but I would tend not to. I would tend to want to go by whatever data I could get and also, by examining him, how he thinks, what is his ability to concentrate, how he handles emotion, etc.
>
> Mr. Kingen: What about the observations of people he was working with?
>
> Dr. Purchard: Well, I think that would be—if they really know. You know, people ca— who know a job—can sometimes fake it along if they really know, and they're there—then, certainly, that would be a source to be considered.

However, the medical experts agreed that the major factor in Mr. Newlun's disability was stress caused by public

humiliation and embarrassment and by the internal battle he continues to wage against readdiction. These stresses were not present in early 1986. At that time, he was not fighting to overcome his addiction and no one in the police department knew about it or the fact he had stolen cocaine which had been seized as evidence. Therefore, the testimony of Mr. Newlun and the people with whom he worked is not at odds with the medical testimony of permanent disability at a later date.

▮ The Department also argues that Mr. Newlun had the burden of proving he could not perform any alternative job with the police department. But the Department's own regulations do not place the burden on an applicant to present evidence of other positions and his inability to perform the duties of the position. The proviso to WAC 415–105–060(2) states:

> [N]o member shall be entitled to a disability retirement allowance *if the appropriate authority advises* that there is an available position for which the member is qualified and to which one of such grade or rank is normally assigned and the board determines that the member is capable of discharging, with average efficiency, the duties of the position.

(Italics ours.) It is the employer's duty to advise of specific, available positions for which the member is qualified. There is no evidence the Spokane Police Department has any available position to which it will assign Mr. Newlun. In fact, Mr. Newlun testified that the police chief told him at the time of his resignation that the police department had no job for him. As stated by Mr. Newlun's counsel in oral argument before this court, it makes no sense to require the applicant to address his ability to perform mythical jobs. Here, Mr. Newlun presented the medical experts with the job description for detective and elicited their opinions regarding whether he had the necessary skills to perform that position. Given the circumstances, we cannot require more.

For the foregoing reasons, we hold the Director's decision that Mr. Newlun was not disabled was clearly erroneous.

## C
### THE APPEALS FROM THE SUPERIOR COURT'S
### AWARD OF BENEFITS

Finally, the City and the Department contend the Superior Court erred in ordering them to pay Mr. Newlun benefits pending appeal. They point out that at the time of the court order neither the Director nor the Superior Court had determined that Mr. Newlun was disabled. Both decisions addressed only the issue of jurisdiction. They argue that without a finding of disability, there could be no award of benefits. We do not need to decide this issue because our holding in this opinion constitutes a finding of disability. Any alleged error in ordering benefits prior to the filing of this opinion is harmless. The effect of our holding is that Mr. Newlun is entitled to benefits beginning December 19, 1986, 6 months after his discontinuance of service. This back benefits award is reduced by the amount of benefits Mr. Newlun has already been paid as the result of the previous court order.

In sum, we affirm the judgment of the Superior Court that the Department had jurisdiction to consider Mr. Newlun's request for a pension. We reverse the Director's decision regarding disability and find that Mr. Newlun is disabled within the meaning of LEOFFA. Finally, we deny Mr. Newlun's request for attorney fees. No authority exists for fees under LEOFFA. *Cf. Interlake Porsche + Audi, Inc. v. Bucholz*, 45 Wn. App. 502, 524, 728 P.2d 597 (1986) (general rule is that a party has no right to attorney fees absent authority in contract, statute or equity), *review denied*, 107 Wn.2d 1022 (1987). Mr. Newlun urges us to adopt the attorney fees provisions of the workers' compensation act as authority for an award. We decline to take

832

such an unprecedented step since it would be an unwarranted incursion into the legislative area.

GREEN and MUNSON, JJ., concur.

Reconsideration denied May 19, 1989.

Review denied at 113 Wn.2d 1014 (1989).