[No. 3735-II.   Division Two.   January 23, 1981.]

LYNFORD SOMER, ET AL, *Appellants*, v. R. Y. WOODHOUSE, *Respondent*.

*Michael R. Rayton,* for appellants.

*Slade Gorton, Attorney General,* and *Richard A. Finnigan, Assistant,* for respondent.

PEARSON, A.C.J.—This case involves a constitutional and statutory challenge by Pay'N Save Corporation to the adoption by the Director of the Department of Licensing of WAC 308-26-005, which interprets the meaning of the term "direct supervision" set forth in RCW 18.34.020. We affirm the trial court's declaration of validity.

In this state, it is a gross misdemeanor to act as a dispensing optician without a license. RCW 18.34.140. Generally speaking, a dispensing optician prepares and dispenses optical wear designed to aid or correct ocular anomalies of the human eye pursuant to written prescriptions of physicians or optometrists. *See* RCW 18.34.060. A licensed dispensing optician may employ up to two apprentices at one time, but only if the licensee provides the apprentices with "training and *direct supervision*." (Italics ours.) RCW 18.34.020, .030.

In early 1977, the Department of Licensing received letters of complaint from the Association of Washington Dispensing Opticians, among others, alleging that Pay'N Save employed apprentice dispensing opticians without licensed personnel in its stores which sell prescription optical wear. Following an investigation, the Department determined that apprentices employed by Pay'N Save worked with licensed supervisors absent from the premises up to 90 percent of the time. When the Department informed Michael Lampman, supervisor of Pay'N Save's optical department, that Pay'N Save apprentices were not adequately supervised, Mr. Lampman responded that the apprentices were in fact receiving "direct supervision" if, at times, only by telephone. He also indicated that the manner in which Pay'N Save supervised its apprentices represented the industry norm.

Failing to obtain voluntary compliance, the Department ordered Mr. Lampman to cease and desist from allowing Pay'N Save apprentice opticians to function outside the direct and constant supervision of a licensed dispensing optician. Mr. Lampman refused to comply with the order on the ground that RCW 18.34.020 requires only "direct

supervision." He correctly argued that RCW 18.34.020 does not contain any explicit language requiring that supervision also be "constant."

The Department next sought temporary and permanent injunctions compelling Pay'N Save's compliance. After the King County Superior Court denied the Department's motion for a temporary restraining order, the Department offered to dismiss the lawsuit with prejudice on the condition that Pay'N Save actively participate in rule making. Subsequently, an order on stipulation was entered to that effect.

On December 22, 1977, a hearing was held before Rossalind Y. Woodhouse, Director of the Department of Licensing. At that time, the Department proposed the adoption of a rule that would require a licensee to be physically present on the premises with each apprentice for a minimum of 80 percent of the time claimed as apprenticeship training. At the conclusion of the hearing, Director Woodhouse called for additional written comments.

On June 22, 1978, a second rules hearing was held. In addition to the Department's proposed 80 percent rule, two other proposals were discussed at that hearing. One proposed rule would have required a supervisor to be physically present on the premises where an apprentice is working a minimum of 100 percent of the time claimed as apprenticeship training during the 3–year apprenticeship period. Pay'N Save proposed a rule requiring a supervisor to be physically present on the premises where an apprentice is working a minimum of 80 percent of the time claimed as apprenticeship training during the first year, or until after an apprentice has passed a preliminary examination. Thereafter, the degree of supervision would have been discretionary, depending upon the experience and ability of the apprentice.

On June 29, 1978, at a third rules hearing, Director Woodhouse adopted WAC 308–26–005, which embodies the Department's own proposal that "direct supervision" be interpreted as requiring a licensee to be physically present

on the premises where the apprentice is working, and available for consultation with the apprentice, a minimum of 80 percent of the time claimed as apprenticeship training.

During at least the first two rules hearings, Director Woodhouse sat at the head table with members of the Dispensing Opticians Board, the entity which writes and grades licensing examinations for prospective dispensing opticians. Some members of the Board were supporters of the Department's proposal, and argued for its adoption at the hearings. The minutes of the rules hearings were entitled "Washington State Board of Dispensing Opticians."

Pursuant to RCW 34.04.070(1), Pay'N Save, along with apprentice opticians Lynford Somer and Jack McElroy, petitioned the Superior Court for Thurston County for a declaratory judgment determining the validity of the rule. The Superior Court held that WAC 308–26–005 is a valid rule which was legally adopted by the Director of the Department of Licensing.

Although Pay'N Save sets forth numerous other assignments of error, our scope of review is limited to the areas of inquiry outlined in RCW 34.04.070(2). Under that provision, we are empowered to declare the rule invalid only if we find that the rule (1) violates constitutional provisions, (2) exceeds the statutory authority of the agency, or (3) was adopted without substantial compliance with statutory rule–making procedures.

### DOES THE RULE VIOLATE CONSTITUTIONAL STANDARDS?

Pay'N Save argues that the adoption of WAC 308–26–005 violates the equal protection clause of the Fourteenth Amendment to the federal constitution. Its rationale is that (1) the rule is a mere continuation of past harassment, and (2) the Department is neither willing nor able to enforce the rule uniformly.

■ The record does not bear out Pay'N Save's contention that it was singled out for alleged "harassment" by the

Department. To the contrary, the Department had previously warned several competing members of the industry not to allow apprentices to work without a licensed supervisor on the premises. The record indicates that only Pay'N Save declined to comply with the Department's initial requests for voluntary compliance. Even assuming that Pay'N Save's competitors continued to allow apprentices to work without licensed personnel on the premises, the mere fact that the Department issued a cease and desist order and sought injunctive relief against Pay'N Save alone would not mean that Pay'N Save was denied equal protection. Laxity in enforcement as to some is not a defense on equal protection grounds to enforcement against others, absent the use of an arbitrary or prohibited ground to determine specific instances of enforcement. *See State v. Lee*, 87 Wn.2d 932, 936, 558 P.2d 236 (1976); *Frame Factory, Inc. v. Department of Ecology*, 21 Wn. App. 50, 57, 583 P.2d 660 (1978). *See also* 16A Am. Jur. 2d *Constitutional Law* § 803, at 949–50 (1979).

■■ As to Pay'N Save's assertion that the Department is neither willing nor able to enforce the rule uniformly, Pay'N Save must shoulder a heavy burden of proof; for, absent evidence to the contrary, public officers are presumed to execute their duties correctly. *State ex rel. Longview Fire Fighters Local 828 v. Longview*, 65 Wn.2d 568, 572, 399 P.2d 1 (1965); *Johnston v. Grays Harbor County Bd. of Adjustment*, 14 Wn. App. 378, 385, 541 P.2d 1232 (1975). Pay'N Save has not offered any proof that the Department of Licensing cannot and will not uniformly enforce the new rule. In addition, because application of WAC 308–26–005 has been stayed pending review, no enforcement action pursuant to the rule has yet been taken against Pay'N Save. It is not the function of this court to resolve purely hypothetical situations. *See Port of Seattle v. State Utils. & Transp. Comm'n*, 92 Wn.2d 789, 806, 597 P.2d 383 (1979).

### Does the Rule Violate Statutory Authority?

Pay'N Save concedes that rules must be written within the framework and policy of the applicable statutes. *See, e.g., Washington Fed'n of State Employees v. Higher Educ. Personnel Bd.,* 87 Wn.2d 823, 827, 557 P.2d 336 (1976); *Rice v. Department of Social & Health Servs.,* 26 Wn. App. 32, 36, 610 P.2d 970 (1980). Pay'N Save argues, however, that adoption of the rule exceeded the allowable ambit of the applicable statute because of, *inter alia,* (1) the common meaning of "direct"; (2) industry practice; (3) the Department's past interpretation; (4) the Department's present interpretation of "identical" language in RCW 18.35.060, the hearing aid statute; and (5) legislative approval by acquiescence of a flexible standard.

■■ As Pay'N Save asserts, unambiguous words within a statute which are not defined therein should be given their ordinary meaning, determined by reference to such extrinsic aids as dictionaries. *Garrison v. State Nursing Bd.,* 87 Wn.2d 195, 550 P.2d 7 (1976); *State ex rel. Catholic Family & Children's Servs. v. Bellingham,* 25 Wn. App. 33, 37, 605 P.2d 788 (1979). The adjective form of "direct" is defined variously in *Webster's Third New International Dictionary* (1969) as "marked by absence of an intervening agency, instrumentality, or influence: IMMEDIATE . . . experienced personally without associative effort of anyone else . . . active, personal, and responsible . . ." Thus, the ordinary meaning of "direct" belies Pay'N Save's assertion that a supervisor not on the immediate premises with the apprentice may provide "direct supervision" through the intervening agency or instrumentality of the telephone.

Next, we turn to the question of industry practice. Pay'N Save argues that the industry has interpreted RCW 18.34-.020 as creating a flexible standard of supervision since its enactment in 1957, and has acted accordingly. The evidence before us indicates that although some members of the industry may also have regarded the statute as allowing for

some flexibility in supervision, only Pay'N Save has interpreted the statute in such a way as to place "direct supervision" within the complete discretion of the supervisor. Two leading competitors of Pay'N Save stated that they had interpreted the statute as requiring 100 percent physical presence of a licensed supervisor, and that their respective businesses had operated accordingly. However, another leading competitor suggested that because of the near impossibility of assuring 100 percent physical presence of a licensed supervisor, it had on occasion allowed its apprentices to operate without a licensed supervisor on the premises. After careful examination of the record, we find that industry practice probably had been to require that a licensed supervisor be physically present on the premises with each apprentice most of the time, if not 100 percent of the time.

Next, we examine the Department's past interpretation of "direct supervision." Pay'N Save directs our attention to a particular instance in 1975 where the Department allegedly acquiesced to the unlicensed operation of two stores owned by a subsidiary of one of Pay'N Save's major competitors. Assuming that in that particular case the Department, for whatever reason, neglected to interpret "direct supervision" as requiring constant physical presence of a licensed supervisor, the Department has often required that supervision be conducted by a licensee on the premises. As we pointed out above, the Department has investigated and warned several other competitors of Pay'N Save that the regular absence of licensed supervisors from premises where apprentices are working violates the supervision requirements of RCW 18.34.020. In addition, Director Woodhouse stated that the Department had previously interpreted the statute as requiring a licensee to be physically present on the premises with each apprentice, even if not for a set percentage of the time. Although the Department's past interpretation of "direct supervision" has not been totally

inflexible, the record indicates that the Department's treatment of that language has not been nearly as elastic as Pay'N Save would have us believe.

█ Next, we turn to the Department's present interpretation of similar language in RCW 18.35.060, the hearing aid statute. Pay'N Save contends, without citation of supporting authority, that the Department should interpret the term "direct supervision" found in the dispensing opticians' statute as flexibly as it interprets similar language in section (1)(c) of the hearing aid statute. An argument unsupported by citation of authority need not be considered on appeal unless meritorious on its face. *Griffin v. Department of Social & Health Servs.*, 91 Wn.2d 616, 630, 590 P.2d 816 (1979). The merit of this contention is not readily apparent. The dispensing opticians' statute and hearing aid statute cover two distinct health care occupations. It is not inconceivable that more stringent standards of supervision may be required in the care of eyes than of ears. In the absence of a more cogent showing than has been made here, we are cognizant of no reasonable justification for expecting the Department to uniformly interpret similar language from unrelated statutes.

Pay'N Save's contention that the legislature "acquiesced" in a flexible interpretation of the term "direct supervision" in the dispensing opticians' statute, when in 1975 it amended unrelated provisions of the hearing aid act without disturbing the Department's interpretation of similar language contained therein, is similarly without merit. Also, the legislature's failure to repudiate the Department's prior interpretation of the hearing aid statute is not conclusive evidence of legislative acquiescence to that interpretation, but is merely one factor to be considered, if indeed it should be considered here at all. *See Pringle v. State*, 77 Wn.2d 569, 573, 464 P.2d 425 (1970). Under the circumstances of this case, we are not convinced that the legislature's action with regard to the hearing aid statute

indicates that it has acquiesced in a more flexible interpretation of "direct supervision" of apprentice dispensing opticians.

Even if we had reached the opposite result in addressing the above arguments put forth by Pay'N Save, we would still be hesitant to declare that adoption of the rule exceeded the bounds of the underlying statute. The legislature has specifically delegated to the Department of Licensing the authority to promulgate rules. *See* RCW 18.34.040, RCW 43.24.020, RCW 46.01.011. Where the legislature has specifically delegated to an administrative agency the power to make rules, there is a presumption that such rules are valid. *Weyerhaeuser Co. v. Department of Ecology,* 86 Wn.2d 310, 314, 545 P.2d 5 (1976); *Barnes v. Washington Natural Gas Co.,* 22 Wn. App. 576, 580, 591 P.2d 461 (1979). Thus, our review of such rules should normally go no further than to ascertain whether the rule is reasonably consistent with the statute it purports to implement. *Weyerhaeuser Co. v. Department of Ecology, supra.*

After careful consideration, we have concluded that WAC 308–26–005 easily meets the requirement that it be reasonably consistent with the statute it purports to interpret. The dispensing opticians' statute, which mandates the licensing of dispensing opticians, was manifestly enacted with the intent of protecting residents of this state from the hazards of poor quality eye care. WAC 308–26–005 is reasonably consistent with that intent, for it is also intended to help ensure that the public receives adequate eye care.

### WAS THE RULE ADOPTED WITHOUT COMPLIANCE WITH STATUTORY RULE–MAKING PROCEDURES?

Pay'N Save argues that the rule is invalid because it was promulgated (1) without a sufficient statement of purpose, RCW 34.04.045, (2) without a statement of reasons for and against adoption, RCW 34.04.025(1)(b), (3) without an adequate record, and (4) in violation of the ex parte communications doctrine. Pay'N Save also makes the related

argument that the rules hearings lacked the appearance of fairness.

Pay'N Save's contention that the Department promulgated the rule without issuing a sufficient statement of purpose is without merit. Even a cursory reading of the statement the Department issued reveals that it is in compliance with RCW 34.04.045.

■ However, Pay'N Save correctly argues that the Department is in technical violation of the RCW 34.04-.025(1)(b) requirement that it issue a concise statement of the principal reasons for and against its adoption, if an interested person so requests. The purpose of the concise statement is not only to assure that the Department actually considered all arguments made, but also to facilitate court review. *Anderson, Leech & Morse, Inc. v. State Liquor Control Bd.*, 89 Wn.2d 688, 693, 575 P.2d 221 (1978). Since no Washington authority adequately addresses the question of what consequences should flow from an agency's failure to provide the required statement, we look to federal law for guidance. The federal counterpart of RCW 34.04.025(1)(b) is 5 USCA § 553(c). *See* Model State Administrative Procedure Act § 3, 14 U.L.A. 388 (1980). Under 5 USCA § 553(c), a statement of "basis and purpose" is required. The absence of this statement may render a rule invalid, for agency action cannot be sustained on *post hoc* rationalizations supplied during judicial review. *Tabor v. Joint Bd. for Enrollment of Actuaries*, 566 F.2d 705, 710 (D.C. Cir. 1977). However, regulations with no statement of basis and purpose at all have been upheld where the court deemed the basis and purpose obvious. *Hoving Corp. v. Federal Trade Comm'n*, 290 F.2d 803, 807 (2d Cir. 1961). Although courts must have an adequate basis to engage in judicial review, they do not function to strike down agency action because of merely formal or technical flaws. *Alabama Ass'n of Ins. Agents v. Board of Governors*, 533 F.2d 224, 236 (5th Cir. 1976).

Although the Department did not comply with the technical requirements of RCW 34.04.025(1)(b), its failure to

comply did not circumvent the purpose of that provision. Not only do the depositions, responsive pleadings, and exhibits provide us with an adequate basis for judicial review, they also indicate that the Department actually considered all the arguments made at the rules hearings. Since the spirit, if not the letter, of the concise statement requirement has been met, we are unable to discern any prejudice to Pay'N Save arising out of the Department's admitted failure to comply with RCW 34.04.025(1)(b).

But perhaps a more compelling consideration in determining the consequences of the Department's failure to issue the statement of purpose is the fact that Pay'N Save did not request the statement until some time after it commenced its declaratory judgment action against the Department. By commencing suit before requesting the statement, Pay'N Save must be deemed to have limited its right to get information from its adversary through appropriate court discovery rules. CR 30, 31, and 36. Pay'N Save may not now be heard to complain that information obtained during such discovery pursuant to judicial review constituted nothing but *post hoc* rationalizations for the Department's adoption of the rule.

Pay'N Save's argument that the Department's failure to keep an accurate and adequate record should also invalidate the rule is also unfounded. Indeed, it is impossible to find in our state administrative procedures act any provision that requires the keeping of a record at an informal rules hearing not required by statute. *See* RCW 34.04.020 *et seq.* Since Pay'N Save cites no relevant authority in support of this argument, we need not deal with it further.

The contention that the ex parte communications doctrine should invalidate the rule is similarly unconvincing. Even if we were to assume the applicability of the doctrine to an administrative decision such as the one before us, we would be compelled to conclude on the basis of the record before us that Director Woodhouse engaged in no ex parte communications of a nature sufficient to invalidate the rule.

■ Finally, we consider the assertion that application of the appearance of fairness doctrine should invalidate this rule. The appearance of fairness doctrine was originally developed within the context of decisions involving zoning or regulation of land use. *See, e.g., Swift v. Island County,* 87 Wn.2d 348, 552 P.2d 175 (1976); *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969). During the evolution of the doctrine, courts have most often applied it to administrative tribunals acting in a quasi–judicial capacity. *See Save a Valuable Environment v. Bothell,* 89 Wn.2d 862, 874, 576 P.2d 401 (1978). Outside of the zoning and land use planning area, courts have generally refused to apply the doctrine to quasi–legislative or administrative actions. *See Fleming v. Tacoma,* 81 Wn.2d 292, 296–98, 502 P.2d 327 (1972). The doctrine has never been applied to administrative action except where a public hearing was required by statute. *See Polygon Corp. v. Seattle,* 90 Wn.2d 59, 67–68, 578 P.2d 1309 (1978); *Seattle v. Loutsis Inv. Co.,* 16 Wn. App. 158, 173, 554 P.2d 379 (1976). In view of the circumstances under which the Department persuaded Pay'N Save to participate in rule making, we are reluctant to summarily conclude that the hearings preceding adoption of the rule in question were not statutorily required. *See* RCW 34.04.025(1)(b).

Even assuming the rules hearings were statutorily required, however, we decline to accept Pay'N Save's invitation to apply the appearance of fairness doctrine to the Department's decision to adopt a rule interpreting an ambiguous statutory term.

Under the facts of this case, application of the doctrine is neither constitutionally nor statutorily required. The strict procedural safeguards commonly applied to guarantee fairness in quasi–judicial hearings adjudicating individual rights do not apply to quasi–legislative hearings. *Apostle v. Seattle,* 77 Wn.2d 59, 66, 459 P.2d 792 (1969). *See also*

*Smith v. Skagit County, supra* at 740–42; B. Schwartz, *Administrative Law* § 70 (1976). In contrast to quasi–judicial administrative action, persons affected by quasi–legislative administrative action are protected from arbitrary agency action by standards delegated by the legislature to guide the agency's exercise of its discretion, and ultimately by the political process itself, rather than by elaborate procedural safeguards. *See State ex rel. York v. Board of County Comm'rs,* 28 Wn.2d 891, 911, 184 P.2d 577, 172 A.L.R. 1001 (1947); *Evergreen School Dist. 114 v. Clark County Comm. on School Dist. Organization,* 27 Wn. App. 826, 621 P.2d 770 (1980).

Where an agency is engaged in rule making in its purest form, additional procedural devices beyond those required by the administrative procedures act are not constitutionally required. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 542, 55 L. Ed. 2d 460, 478, 98 S. Ct. 1197, 1211 (1978). *Cf. Bellevue v. King County Boundary Review Bd.,* 90 Wn.2d 856, 863, 586 P.2d 470 (1978) (appearance of fairness doctrine not constitutionally based). *See generally* Alkire, *Washington's Super–Zoning Commission,* 14 Gonz. L. Rev. 559, 577–584 (1979).

No provision of the state administrative procedures act through which the legislature has delegated standards for the Department's rule–making procedures authorizes application of the appearance of fairness doctrine. Even if the appearance of fairness doctrine were applicable here, we would find that no violation had occurred. Although we may dispute the wisdom of Director Woodhouse's decision to seat herself at the same table with vocal proponents of the rule, and we may acknowledge the irregularity apparent in the titles of the rules hearing minutes, we do not agree that such failures of decorum created the appearance of bias on the part of the Director.

Accordingly, the declaration of validity of WAC 308–26–005 by the Superior Court is affirmed.

PETRIE, J., and JOHNSON, J. Pro Tem., concur.

Reconsideration denied February 27, 1981.

Review denied by Supreme Court May 8, 1981.