[No. 54608–8. En Banc. July 13, 1989.]

AMERICAN NETWORK, INC., ET AL, *Respondents,* v. THE
UTILITIES AND TRANSPORTATION COMMISSION,
ET AL, *Appellants.*

*Kenneth O. Eikenberry, Attorney General, James R. Cunningham, Senior Assistant,* and *Donald T. Trotter, Assistant,* for appellant Utilities and Transportation Commission.

*Edward T. Shaw* and *Douglas N. Owens,* for appellant Pacific Northwest Bell.

*W.K. McInerney, Jr.,* and *James D. Oesterle* (of *McInerney, Baker & Kinnear*), for respondent American Network, Inc.

*John P. McDonald,* for respondent Comnet, Inc.

SMITH, J.—This is an appeal by the Washington Utilities and Transportation Commission (Commission) from an order of the Superior Court of Washington for Thurston County dated November 6, 1987, which declared invalid a *security deposit rule* adopted by the Commission through an order dated May 12, 1986 (effective July 31, 1986) as (1) an undue, though indirect, burden on interstate commerce without proof of "legitimate intrastate objectives" and "no less onerous alternatives;" and, (2) violation of the equal protection clause of the Fourteenth Amendment through discrimination against interexchange telecommunications companies as a class, absent "explicit showing" and "definitive determination" of need for the security deposit rule.

Pacific Northwest Bell Telephone Company (Pacific Northwest Bell) joined as additional appellants.

Respondents are American Network, Inc. (AmNet) and COMNET, Inc. (Comnet).

This court granted direct review on May 8, 1988. We find that the Washington Utilities and Transportation Commission enacted the security deposit rule pursuant to its proper and lawful authority. We therefore reverse the order of the Superior Court.

## ISSUES PRESENTED

The issues involved in this case may be summarized as follows:

1. Whether the Washington Utilities and Transportation Commission had statutory or other enabling authority to promulgate WAC 480–120–057 and WAC 480–120–021, the security deposit rule;

2. If the Commission had authority to promulgate the security deposit rule, then whether the Commission, in exercising its authority, violated the commerce clause, article 1, section 8 of the United States Constitution; and

3. If the Commission had authority to promulgate the security rule, then whether the Commission, in exercising its authority, violated the equal protection clause of the fourteenth amendment to the United States Constitution or the special privileges and immunities clause, article 1, section 12 of the Washington State Constitution.

### ARTICULATED POSITIONS OF THE PARTIES

Appellant Washington Utilities and Transportation Commission argued that the Superior Court erred in declaring the deposit rule invalid because the rule constitutes a legitimate, reasonable regulation of the operations of intrastate companies which are expressly subject to Commission regulation. Appellant Commission also argued that the rule imposes no "indirect burden" on interstate commerce that would involve the commerce clause; and even if such a burden is shown, the "balancing of interests" favors the regulation.

Appellant Commission additionally argued that the classification of interexchange telecommunications companies is a valid classification for the purpose of a deposit rule. The Commission asserted that all interexchange telecommunications companies are treated equally and that a rational relationship exists between the classification and valid regulatory purposes, thus meeting this court's test for equal protection of the laws under both federal and state constitutions.

Respondent AmNet argued that the deposit rule is completely antithetical to the proclaimed policy of the Legislature to encourage competitive telecommunications services

in this state in that the rule imposes a new cost associated with providing services, thus making it more expensive for all long distance service ratepayers.

Respondent AmNet further argued that the deposit rule effectively imposes a regulation which grants preferences to some and unduly prejudices others. AmNet concluded that the Commission's "interference with the objectives of the statute" is beyond the scope of its authority.

Intervenor–Respondent Comnet argued that the absence of specific factual determinations by the Commission precludes any assertion that the deposit rule, or any classification within the rule or deriving in any way from the terms of the rule or its criteria, is reasonable, rational or can be presumed to be so.

### STATUTES AND SECURITY DEPOSIT RULE

The full text of the deposit rule appears in WAC 480–120–057. In the order amending and adopting rules permanently (General Order R–250, p. 3–4), the Commission ruled:

> . . . While interexchange carriers are customers of the local exchange carrier, they also provide unique services to the public in that they themselves are offering telecommunications services. As second level carriers, they may incur large bills very swiftly, but may have little in the way of assets in the event that financial difficulties might be encountered, putting collection of those bills by the local exchange carrier in jeopardy. Because they are in turn carriers, using interconnection with the local exchange network as the foundation of their business activities, the Commission finds them to be a unique customer class for which normal deposit rules do not accord the local exchange provider with adequate protection against financial loss, to the possible detriment of monopoly ratepayers the Commission believes that either the prepayment or the deposit alternatives in the rule adopted herein are consistent with the public interest.
>
> The rule change affects no economic values.

Under RCW 80.01.040 and RCW 80.36, the Commission is given regulatory authority over intrastate telecommunications. RCW 80.01.040 grants to the Commission the

power to regulate telecommunications "in the public interest" and to "[m]ake such rules and regulations as may be necessary to carry out its other powers and duties." In exercise of that statutory authority, the Commission has defined interexchange telecommunications companies (ITC's) as companies which provide telecommunications services for hire within the state, but which do not provide basic telephone service. RCW 80.04.010; WAC 480–120–021(2).

For the "public interest" purpose of protecting against increased costs to ultimate ratepayers resulting from interexchange telecommunications company failures and defaults, the Commission promulgated the disputed security deposit rule under new section WAC 480–120–057, establishing alternative objective financial criteria which an interexchange telecommunications company may use to establish credit.

WAC 480–120–057(1) provides as follows:

(1) Establishment of credit—interexchange telecommunications company. An interexchange telecommunications company may establish credit by demonstrating to the utility any one of the following subdivisions (a) or (b) of this subsection, subject to the provisions of subsection (4) of this section [relating to amount of deposit or security]:

(a) Corporate debt rating. The interexchange telecommunications company or, if the interexchange telecommunications company is unable to comply with this provision, its parent or affiliated company, has undertaken to guarantee the payment of all charges incurred by the subscribing interexchange telecommunications company, has a corporate debt rating, according to Standard and Poor's of BBB or higher, or according to Moody's of Baa or higher, with respect to any outstanding general debt obligation; or

(b) When the interexchange telecommunications company has demonstrated to the utility, through the bimonthly provision of certified financial statements, the following financial criteria:

(i) A positive cash flow from total company operations over the past twelve months.

(ii) A minimum level of net worth at least equivalent to the deposit which would otherwise be required.

(iii) A current ratio (current assets–to–current liabilities) of 1.1 to 1 or a debt–to–equity ratio of 1.8 to 1.

(iv) A minimum accounts receivable turnover. ratio (annual sales divided by average accounts receivable) of four over the last twelve months.

WAC 480–120–057(1).

### SUMMARY OF FACTS

In 1984, American Telephone and Telegraph Company (AT&T) divested itself of local Bell telephone companies, including Pacific Northwest Bell Telephone Company. *See United States v. AT&T,* 552 F. Supp. 131, 195–97 (D.D.C. 1982), *aff'd,* 460 U.S. 1001, 75 L. Ed. 2d 472, 103 S. Ct. 1240 (1983). Pursuant to the court ordered divestiture, Pacific Northwest Bell was required to make the technical changes necessary to provide interexchange telecommunications companies with "access . . . equal in type, quality, and price to that provided to AT & T and its affiliates." *United States v. AT&T,* 552 F. Supp. at 227. The conversion was ordered to be substantially completed by September 1, 1986. 552 F. Supp. at 233.

Following the increase in access prices with the conversion to equal access, 20 percent of the reseller ITC's obtaining access from Pacific Northwest Bell failed during the 18 months preceding adoption of the deposit rule by the Commission. One of those failures, which left Pacific Northwest Bell with a large uncollected debt, occurred 1 month after an ITC's deposit had been refunded pursuant to the deposit rule then in existence which allowed a refund where the ITC had paid its bills consistently for 12 months. *See* WAC 480–120–056(11)(a).

Following the AT&T divestiture, new ITC's entered the market and began to compete with Pacific Northwest Bell, which previously held the *intrastate* monopoly on services, and with AT&T, which previously held the *interstate* monopoly on services.

As defined by RCW 80.04.010 and WAC 480–120–021(2), interexchange telecommunications companies are those which provide telecommunications services for hire within

the state of Washington, but which do not provide basic telephone service. They operate by purchasing access from a local exchange telephone company, such as Pacific Northwest Bell or General Telephone Company, and then reselling those services to the ultimate consumer.

In 1985 the "Telecommunications Act" was amended to permit interexchange telecommunications companies to seek a "competitive classification." RCW 80.36. After classification, an ITC is subject to "minimal regulation," which means that "competitive telecommunications companies may file, instead of tariffs, price lists which shall be effective after ten days' notice to the commission and customers." RCW 80.36.320(2). The statute also gives the Utilities and Transportation Commission discretion to waive various regulatory requirements for those companies. The Commission has waived certain regulatory requirements, but has never waived deposit rules. With the exception of pricing flexibility and other waivers granted for implementing a "phase in" period offering ITC's local access equal to that of AT&T, interexchange telecommunications companies are subject to the remaining provisions of RCW Title 80 and Commission rules.

In September 1985 Pacific Northwest Bell requested the Commission to adopt a new rule requiring ITC's to post a security deposit or establish credit according to specific financial criteria as a precondition to purchasing access to local exchange lines. It cited the need for protection of local exchange telephone companies (LEC's) and their ultimate ratepayers/customers from numerous failing ITC's which already had proven to be significant credit risks.

Under the prior deposit rule, the only restriction on the right of LEC's to require deposits before providing service was contained in the Commission's rule, WAC 480-120-056. That rule provided for nonresidential customers, including ITC's, who could not "demonstrate satisfactory credit by reasonable means appropriate under the circumstances" or who had been in default, to deposit up to two-twelfths of

their estimated annual billings. WAC 480–120–056(2), (3)(a), (4)(a)(i).

WAC 480–120–056 provides no objective standard of creditworthiness to guide local exchange companies in determining what are "reasonable means appropriate under the circumstances" in demonstrating satisfactory credit. There is no provision in WAC 480–120–056 for any alternative to a cash deposit of up to 2 months' estimated bills. WAC 480–120–056(11) provides for refund of a deposit after 12 consecutive months of satisfactory payment or upon disconnection of services. The new deposit rule creates a specific classification for interexchange telecommunications companies, WAC 480–120–021, and a plan for those companies to provide credit or security, WAC 480–120–057.

After various amendment and comment proceedings, the Commission adopted an amended version of the security deposit rule on April 20, 1986, promulgated by order dated May 12, 1986, with an effective date of July 31, 1986, to allow time for compliance.

The new deposit rule requires that all ITC's, including AmNet, as a condition for obtaining service from a local exchange company, must either (1) establish credit pursuant to WAC 480–120–057(1)(a) or (b); (2) provide the utility with a deposit or other security pursuant to WAC 480–020–057(2); or (3) make payment for access service in advance pursuant to WAC 480–120–057(9).

Under the deposit rule, an ITC may establish credit in either of two ways: (1) by demonstrating that the ITC (or its corporate parent, which agrees to guarantee the ITC's debt) has a corporate debt rating by Standard and Poor's of BBB or higher or by Moody's of Baa or higher; or (2) by demonstrating, through bimonthly certified financial statements, that (a) total company operations over the preceding 12 months have generated a positive cash flow; (b) the ITC's net worth is at least equivalent to the deposit which would otherwise be required; (c) the ITC has a current assets–to–liabilities ratio of 1.1 to 1 or a debt–to–equity ratio of 1.8 to 1; and (d) the ITC has a minimum accounts

receivable turnover ratio of 4 over the preceding 12 months (annual sales divided by average accounts receivable).

In the event an interexchange telecommunications company cannot establish creditworthiness as indicated above, it alternatively must provide the local exchange company either prepayment of 1 month's charges (based on the most recent month's billings and subject to adjustment at the end of each prepaid month), *or* a security deposit consisting of cash, letters of credit, *or* a surety bond in the amount of 2 months' estimated billings.

The deposit rule further provides that an interexchange telecommunications company may again be subject to the deposit or prepayment requirement if either it has been disconnected during the preceding 12–month period for failure to pay, it has been served with two delinquency notices during the same period by any utility, or it has an outstanding balance owed to any utility at the time it seeks service connection.

Under the rule, security deposits are returned to ITC's with interest at a legally designated rate upon termination of service (less any amount they owe the local exchange companies for services) or upon establishment of credit according to the financial criteria specified above.

On August 4, 1986, American Network, Inc. (AmNet), pursuant to former RCW 34.04.070, filed its petition for declaratory judgment in Thurston County challenging the constitutionality of the security deposit rule.

On November 6, 1987, the trial court declared the security deposit rule invalid and enjoined its enforcement on the grounds that it violated the commerce clause and the equal protection clause of the fourteenth amendment to the United States Constitution.

STATUTORY ENABLING AUTHORITY FOR
THE SECURITY DEPOSIT RULE

 Under former RCW 34.04.070(2)[1] (Washington administrative procedure act), a rule may be declared invalid only if it violates the constitution or a statute or was adopted without compliance with statutory procedures. Consequently, a court will not substitute its judgment for that of an agency. Nor will it examine a record for substantial evidence in reviewing a declaratory judgment on the validity of a rule. These are solely legislative areas of concern if no constitutional or statutory violation is involved. Regulations which neither involve suspect criteria nor affect fundamental interests are presumed valid, unless it can be shown that they violate the constitution or a statute. The burden is on the complaining party to show such violation. *Paulson v. County of Pierce*, 99 Wn.2d 645, 664 P.2d 1202, *appeal dismissed*, 464 U.S. 957, 78 L. Ed. 2d 331, 104 S. Ct. 386 (1983). *See also Vliet v. Department of Labor & Indus.*, 30 Wn. App. 709, 638 P.2d 112 (1981), *review denied*, 97 Wn.2d 1002 (1982); *Somer v. Woodhouse*, 28 Wn. App. 262, 623 P.2d 1164, *review denied*, 95 Wn.2d 1019 (1981). Regulations will not be struck down unless "'compelling reasons are presented sufficient to show the scheme is in conflict with the intent and purpose of the legislation.'" *Hi–Starr, Inc. v. Liquor Control Bd.*, 106 Wn.2d 455, 459, 722 P.2d 808 (1986) (quoting *Anderson, Leech & Morse, Inc. v. State Liquor Control Bd.*, 89 Wn.2d 688, 695, 575 P.2d 221 (1978); *Weyerhaeuser v. Department of Ecology*, 86 Wn.2d 310, 317, 545 P.2d 5 (1976)). *See also International Fed'n of Professional & Technical Eng'rs, Local 17 v. State Personnel Bd.*, 47 Wn. App. 465, 469, 470, 736 P.2d 280, *review denied*, 108 Wn.2d 1036

---

[1]Now codified under RCW 34.05.570(2)(c).

(1987); *Barrington v. Eastern Wash. Univ.*, 41 Wn. App. 259, 265, 703 P.2d 1066, *review denied,* 104 Wn.2d 1019 (1985).

The Superior Court's holding that the security deposit rule is "discriminatory" and constitutes an "undue" burden on interstate telecommunications indicates its conclusion that the Commission's fact–finding was inadequate to support the credit requirements imposed upon ITC's by the security deposit rule, and was inadequate absent a clear finding that the intrastate consumer protection objectives of the rule could not be accomplished by less onerous credit requirements.

EXERCISE OF AUTHORITY BY COMMISSION
UNDER STATUTE

We find that the security deposit rule was promulgated by the Washington Utilities and Transportation Commission according to proper enabling authority under RCW 80.01.040 and RCW 80.36 which grants power to the Commission to regulate telecommunications "in the public interest" and to "[m]ake such rules and regulations as may be necessary to carry out its other powers and duties." In addition, the trial record and administrative record support the Commission's decision to promulgate the rule upon adequate fact–finding proceedings required by former RCW 34.04, administrative procedure act.[2]

There is no evidence that the Commission's findings were in error or were reached by means not authorized by the Commission's rulemaking authority under RCW 80.01.040 and RCW 80.36. In fact, the trial record indicates that the security deposit rule was adopted only after extensive comments were received during the proceedings leading to adoption of the rule. Based upon the small business economic impact statement prepared by the Commission's staff and the comments received from various interested

---

[2]See recodification under RCW 34.05.

parties,[3] the Commission concluded that ITC defaults pose a significant threat of unsecured losses, resulting in rate increases to captive LEC ratepayers.

The Commission agreed with Pacific Northwest Bell that the existing deposit rule was inadequate because it was based on payment history alone and was not an accurate measure of an ITC's current stability, liquidity or ability to pay short–term debt. The Commission authorized criteria under the new deposit rule for extending access to ITC's based on continuing financial strength of the entities, and not merely on past payment record.

■ The security deposit rule ultimately adopted reflects the Commission's balancing of ratepayer protection with reasonable, workable credit requirements which do not inhibit growth of a competitive telecommunications industry. Moreover, neither the reasonableness of a rule nor the factual basis which leads an agency to adopt a rule is properly the concern of the court under former RCW 34.04.070. *Weyerhaeuser v. Department of Ecology,* 86 Wn.2d 310, 314, 545 P.2d 5 (1976). *See also Federated Am. Ins. Co. v. Marquardt,* 108 Wn.2d 651, 655, 741 P.2d 18 (1987); *Brannan v. Department of Labor & Indus.,* 104 Wn.2d 55, 60, 700 P.2d 1139 (1985); *Asarco, Inc. v. Puget Sound Air Pollution Control Agency,* 51 Wn. App. 49, 56, 751 P.2d 1229, *review granted,* 111 Wn.2d 1001 (1988).

### CONSTITUTIONAL CHALLENGES TO THE SECURITY DEPOSIT RULE

The Thurston County Superior Court held that (1) the security deposit rule, as adopted, is discriminatory in the absence of an explicit showing and a definitive determination of necessity for the stringent credit requirements

---

[3]AT&T Communications of the Pacific Northwest, Pacific Northwest Bell Telephone Company, Washington Telecommunications Ratepayers Association for Cost–Effective and Equitable Rates (TRACER), American Sharecom, Inc., Northwest Association of Telecommunications Carriers, American Network, Inc., ExecuLines, Inc., GTE Sprint Communications Corporation, MCI Telecommunications Corporation, and General Telephone Company of the Northwest, Inc.

imposed upon the interexchange carriers (ITC's); and (2) the security deposit rule, as adopted, casts undue, albeit indirect, burdens upon interstate telephone communications of ITC's covered by the rule, absent a clear showing and finding that "interstate" [*sic*][4] objectives, including consumer protection, sought to be reached cannot be accomplished by less onerous credit requirements. Those findings correspond to the issues raised by the parties on appeal.

#### COMMERCE CLAUSE

The trial court rejected AmNet's claim that the security deposit rule casts a direct burden on interstate commerce, holding that any burdens were "indirect." The court reasoned that if ITC's such as AmNet have to pay a higher deposit, they will have less to spend on their interstate business, resulting in diminished business and profits.

However, such indirect burdens are not unconstitutional impositions on interstate commerce unauthorized by federal law. In fact, the dual state/federal regulatory system contemplates the type of state regulation of intrastate firms involved in this case. Congress has authority to define the manner in which regulation by the states may affect interstate commerce. *Southern Pac. Co. v. Arizona ex rel. Sullivan,* 325 U.S. 761, 769, 89 L. Ed. 1915, 65 S. Ct. 1515 (1945). *Accord, Burlington N. R.R. v. Department of Pub. Serv. Regulation,* 763 F.2d 1106, 1114 (9th Cir. 1985).

In enacting the Telecommunications Act of 1934, Congress recognized that states have plenary authority to regulate intrastate telecommunications. *See* 47 U.S.C. § 152(b) (1982). Thus, state regulation of intrastate utility operations does not constitute an unconstitutional burden on interstate commerce unauthorized by federal law. *See Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 90 L. Ed. 2d 369, 106 S. Ct. 1890 (1986).

---

[4]The actual order contains a typographical error. The word should be "intrastate" consistent with a letter from the trial judge dated September 3, 1987.

■ According to the United States Supreme Court in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 25 L. Ed. 2d 174, 90 S. Ct. 844 (1970), not every exercise of state power with some impact on interstate commerce is invalid.

> Although the criteria for determining the validity of state statutes affecting interstate commerce have been variously stated, the general rule that emerges can be phrased as follows: Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.

*Pike,* at 142. *See also Evergreen Waste Sys., Inc. v. Metro Serv. Dist.,* 820 F.2d 1482 (9th Cir. 1987); *Washington State Bldg. & Constr. Trades Coun. v. Spellman,* 684 F.2d 627 (9th Cir. 1982), *cert. denied,* 461 U.S. 913 (1983); *Haberman v. WPPSS,* 109 Wn.2d 107, 136, 744 P.2d 1032, 750 P.2d 254 (1987).

The United States Supreme Court has consistently approved state regulation of intrastate public service company activities against claims that such regulation burdened interstate commerce. *See, e.g., Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 90 L. Ed. 2d 369, 106 S. Ct. 1890 (1986); *Minnesota Rate Cases,* 230 U.S. 352, 57 L. Ed. 1511, 33 S. Ct. 729 (1913).

Since AmNet is challenging the validity of the deposit rule, it has the burden of presenting compelling reasons why the rule is in conflict with legislative intent. *Vliet v. Department of Labor & Indus.,* 30 Wn. App. 709, 638 P.2d 112 (1981), *review denied,* 97 Wn.2d 1002 (1982). AmNet contended that the deposit rule promulgated by the Commission constitutes a burden so expensive that it will deplete the financial resources of ITC's. The increased financial burden imposed by compliance with the deposit rule, it argued, lessens the ability of AmNet and similarly situated ITC's to properly serve interstate commerce. AmNet asserted that the deposit rule would force smaller

telecommunications providers such as ITC's out of business, contravening the legislative intent behind divestiture. However, AmNet provided no citations or evidence that the alternative financial tests under WAC 480–120–057(1)(b) are as "prohibitive" for small ITC's as the bond rating tests. The alternative financial tests relate directly to liquidity of a business, which is a crucial factor in its ability to meet its financial obligations. Of approximately 40 ITC's doing business with Pacific Northwest Bell, only 6 did not meet the financial criteria of the rule and were required to post a deposit or provide security for payment.

AmNet cited three cases in support of its contention that the deposit rule substantially affects interstate commerce. However, those cases demonstrate that the deposit rule does *not* substantially affect interstate commerce in a constitutional sense.

AmNet cited *Western Union Tel. Co. v. Public Serv. Comm'n,* 127 Mich. App. 88, 338 N.W.2d 731 (1983) and *Panhandle Eastern Pipeline Co. v. Public Utils. Comm'n,* 56 Ohio St. 2d 334, 383 N.E.2d 1163 (1978). In both cases a state's securities approval statute, as it applied to multistate utilities, was invalidated on commerce clause grounds. The courts noted that securities issued by multistate utilities can be subject to regulation by numerous state jurisdictions. The Michigan court in particular recognized that issuance of securities is a single, indivisible act, effectively giving a state "veto" power over the issuance. *Western Union,* 338 N.W.2d at 735. Both courts recognized that the commerce clause may invalidate a contrary state regulation if national uniformity is necessary. *Western Union,* 338 N.W.2d at 733–34; *Panhandle,* 383 N.E.2d at 1167.

Neither the Michigan case nor the Ohio case supports AmNet's position. ITC's are billed under separate tariffs for intrastate service and for interstate service. Deposit rules for intrastate operations vary from state to state. AmNet has shown no need or justification for "national uniformity" which would invalidate this state's intrastate deposit rules.

AmNet cited *Colorado v. United States,* 271 U.S. 153, 70 L. Ed. 878, 46 S. Ct. 452 (1926). In that case, the State of Colorado sought to enjoin the Interstate Commerce Commission (ICC) from permitting a railroad to abandon a line located wholly within the state. Colorado argued that the federal government had no authority under the commerce clause to regulate a service operating entirely intrastate. The Supreme Court disagreed. It determined that the ICC had exercised its abandonment authority pursuant to a specific grant from Congress. In the case now before this court, there is no such specific grant which would preempt state regulation of a service operated entirely intrastate.

This court has previously announced the standard for balancing state and federal interests where a state regulation is challenged as interfering with interstate commerce. In *Whitaker v. Spiegel, Inc.,* 95 Wn.2d 661, 623 P.2d 1147, 637 P.2d 235, *appeal dismissed,* 454 U.S. 958, 70 L. Ed. 2d 374, 102 S. Ct. 496 (1981), this court concluded that (1) it will only balance local and national interests when they are "comparable;" (2) the burden envisioned in the balancing test is impressed upon the "actual instrumentalities of interstate commerce, *i.e.,* the mode of transportation that permits free physical flow of goods"; and (3) in the absence of "predominant national concern," *only some state benefit need be advanced and only some method of furthering the state goal need exist. Whitaker,* 95 Wn.2d at 676.

The *Whitaker* standard is clearly applicable to this case: (1) a local ITC doing business in Washington faces the same deposit rule as out–of–state ITC's that enter this state and open a local business; (2) the deposit rule does not regulate the instrumentalities of commerce, but regulates only intrastate usage of telecommunications services; and (3) the predominant national concern is for a dual state/federal regulatory scheme. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 370. There is no "national concern" prohibiting Commission rulemaking for intrastate ITC's.

The legitimate state goal of protecting monopoly ratepayers is met by application of basic minimum financial

criteria that are reasonable. The security deposit rule provides that an ITC unable to post a deposit, letter of credit or other security at a certain level can instead take steps to maintain appropriate service consistent with its financial stability.

■ AmNet claimed that the security deposit rule threatens continued access to LEC services which ITC's need for their interstate and intrastate business, and that the rule reduces the working capital of AmNet and other ITC's. However, those claims alone are insufficient to support a constitutional challenge to the deposit rule based upon the commerce clause. *Burlington Northern,* 763 F.2d at 1114. Economic hardship in itself is not sufficient to invalidate as unconstitutional a state regulation affecting interstate commerce. *Whitaker,* 95 Wn.2d at 675 (citing *American Can Co. v. Oregon Liquor Control Comm'n,* 15 Or. App. 618, 638, 517 P.2d 691 (1973); *Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 57 L. Ed. 2d 91, 98 S. Ct. 2207 (1978)).

### EXERCISE OF AUTHORITY BY COMMISSION
### UNDER COMMERCE CLAUSE

The security deposit rule is a legitimate exercise of state regulatory authority by the Washington Utilities and Transportation Commission. It is separable from interstate communications because it applies only to intrastate usage. The rule applies only to ITC's seeking to conduct intrastate telecommunications business either entirely intrastate or in conjunction with interstate business. It does not supplant any interstate deposit requirement nor does it regulate interstate instrumentalities.

■ The security deposit rule does not violate the commerce clause because the dual state/federal regulation scheme established by Congress allows indirect burdens on interstate commerce by state regulation of intrastate commerce. Even if the indirect burdens are significant or raise constitutional issues, the applicable balancing test (state benefit versus burden on interstate commerce) supports the

security deposit rule absent a showing that the rule applies differently to interstate companies than to purely intrastate companies.

## THE EQUAL PROTECTION CLAUSE AND THE WASHINGTON PRIVILEGES AND IMMUNITIES CLAUSE

The equal protection clause of the fourteenth amendment to the United States Constitution provides:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The privileges and immunities clause of the Washington State Constitution (article 1, section 12) provides:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

█ The privileges and immunities clause of the Washington State Constitution (article 1, section 12) and the equal protection clause of the Fourteenth Amendment are substantially identical and have been considered by this court as one issue. *Texas Co. v. Cohn,* 8 Wn.2d 360, 374, 112 P.2d 522 (1941). *Accord, Olsen v. Delmore,* 48 Wn.2d 545, 550, 295 P.2d 324 (1956); *Equitable Shipyards, Inc. v. State,* 93 Wn.2d 465, 476, 611 P.2d 396 (1980). Accordingly, we consider the state and federal constitutional issues in this case as one equal protection issue.

█ This court has held that in reviewing a challenge to legislation under the equal protection clause, where the classification neither involves suspect criteria (race, religion, national origin, alienage, gender)[5] nor affects fundamental interests (*e.g.,* free speech, privacy, voting rights), the court

---

[5]Under Washington law, gender is considered a suspect classification. Const. art. 1, § 12; RCW 49.60.010, .030; state equal rights amendment (Const. art. 31).

will engage in only minimum scrutiny of the enactment, *Paulson v. County of Pierce,* 99 Wn.2d 645, 652, 664 P.2d 1202 (citing *McGowan v. Maryland,* 366 U.S. 420, 425–26, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961); *Nielsen v. Washington State Bar Ass'n,* 90 Wn.2d 818, 820, 585 P.2d 1191 (1978)), *appeal dismissed,* 464 U.S. 957, 78 L. Ed. 2d 331, 104 S. Ct. 386 (1983), and the challenger bears a heavy burden to show there is no rational basis for the classification. *Paulson,* at 653 (citing *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs,* 92 Wn.2d 831, 836, 601 P.2d 936 (1979), *appeal dismissed,* 446 U.S. 979 (1980)). *See also Convention Ctr. Coalition v. Seattle,* 107 Wn.2d 370, 378, 730 P.2d 636 (1986).

In *Paulson,* this court also ruled that under the minimum scrutiny test, the classification need only (1) apply alike to all members within the designated class; (2) be based on reasonable distinctions between those within and those outside the class; and (3) bear a rational relationship to the purpose of the legislation. *Paulson,* 99 Wn.2d at 653. *Accord, Grader v. Lynnwood,* 45 Wn. App. 876, 881, 728 P.2d 1057 (1986); *State v. Ham,* 39 Wn. App. 7, 9, 691 P.2d 239 (1984).

■ The appropriate equal protection test for a purely economic regulation is the "minimum scrutiny" or "rational basis" test. *Myrick v. Board of Pierce Cy. Comm'rs,* 102 Wn.2d 698, 701, 677 P.2d 140, 687 P.2d 1152 (1984), citing *Equitable Shipyards, Inc. v. State,* 93 Wn.2d 465, 611 P.2d 396 (1980). Under this test, we have consistently held that economic and business regulations carry a strong presumption of constitutionality. *See also Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 55 L. Ed. 369, 377, 31 S. Ct. 337, 340 (1911); *Salstrom's Vehicles, Inc. v. Department of Motor Vehicles,* 87 Wn.2d 686, 690–91, 555 P.2d

---

*Darrin v. Gould,* 85 Wn.2d 859, 540 P.2d 882 (1975). However, gender is not considered a suspect classification under the fifth and fourteenth amendments to the United States Constitution. *Frontiero v. Richardson,* 411 U.S. 677, 36 L. Ed. 2d 583, 93 S. Ct. 1764 (1973).

1361 (1976); *Aetna Life Ins. Co. v. Washington Life & Disab. Ins. Guar. Ass'n,* 83 Wn.2d 523, 528, 520 P.2d 162 (1974); Note, *Developments in the Law—Equal Protection,* 82 Harv. L. Rev. 1065, 1083 (1969).

Under the equal protection clause, a state's statutory classifications need only bear a rational relationship to a legitimate state interest. *See United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 174–76, 66 L. Ed. 2d 368, 101 S. Ct. 453, *reh'g denied,* 450 U.S. 960 (1980); *Dandridge v. Williams,* 397 U.S. 471, 485, 25 L. Ed. 2d 491, 90 S. Ct. 1153, 1161 (1970); *McGowan v. Maryland,* 366 U.S. 420, 426, 6 L. Ed. 2d 393, 81 S. Ct. 1101, 1105 (1961); *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 99 L. Ed. 563, 75 S. Ct. 461 (1955); *Rivera v. Becerra,* 714 F.2d 887 (9th Cir. 1983), *cert. denied,* 465 U.S. 1099 (1984); *Conklin v. Shinpoch,* 107 Wn.2d 410, 417, 418, 730 P.2d 643 (1986). *Accord, Hoffman v. United States,* 767 F.2d 1431, 1437 n.7 (9th Cir. 1985).

This court has expressly held that judicial deference is particularly necessary when the legislation in question relates to purely business and economic activity. *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs, supra. See Conklin v. Shinpoch, supra* at 417; *Lenci v. Seattle,* 63 Wn.2d 664, 668, 388 P.2d 926 (1964). In equal protection cases, a particularly heavy presumption of constitutionality applies when the statute concerns economic matters. *See Yakima Cy. Deputy Sheriff's Ass'n,* 92 Wn.2d at 844 (Utter, C.J., concurring).

The trial court in this case imposed a stricter standard than necessary for equal protection analysis of an economic regulation. The court ruled that the security deposit rule was "discriminatory in the absence of an explicit showing and a definitive determination of necessity for the stringent requirement imposed upon the [ITC's]." The court incorrectly placed upon the Commission the burden of providing an "explicit showing" and "definitive determination of necessity" for the rule. This "strict scrutiny" burden would

be appropriate for state action involving suspect classifications and fundamental rights. It is inappropriate under the "rational basis" test for state economic legislation not involving those classifications or rights.

The trial court erred in requiring an "explicit showing" and "definitive determination" rather than requiring an assumption of "every state of facts sufficient to sustain a classification which reasonably can be conceived" under our decisions on equal protection issues utilizing the "rational basis" test. *See Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs, supra; Haberman v. WPPSS,* 109 Wn.2d 107, 744 P.2d 1032, 750 P.2d 254 (1987); *Convention Ctr. Coalition v. Seattle,* 107 Wn.2d 370, 730 P.2d 636 (1986); *State ex rel. Graham v. San Juan Cy.,* 102 Wn.2d 311, 686 P.2d 1073 (1984).

#### EQUAL PROTECTION AND "RATIONAL BASIS" TEST

The requirements of the *Paulson* "rational basis" test are fully satisfied by the security deposit rule. The rule applies alike to all members within the designated class; there are reasonable grounds for distinguishing those within the class from those outside the class; and the classification has a rational relationship to the purposes of the rule. *See Convention Center Coalition,* at 378–79.

The security deposit rule applies alike to all ITC's defined in WAC 480–120–021. The minimum financial criteria required by the rule are reasonable and relate directly to liquidity of a business, which is a crucial factor in its ability to pay its bills. Any ITC meeting the minimum financial criteria of the rule need not post a deposit. Any ITC that cannot meet the minimum financial criteria of the rule can post a deposit, furnish security, or prepay 1 month's billing. It is not sufficient for a constitutional claim merely to assert or show that some ITC's cannot meet the minimum financial requirements.

AmNet contended that the Commission failed to show that ITC's have higher default rates and generate more bills (or more unpaid bills) than all other businesses as a

class and that the security deposit rule singles out a class of Pacific Northwest Bell's own competitors, forcing some of them out of business.

There are reasonable grounds for distinguishing those within the class of ITC's from those outside the class. The Commission has a legitimate function in regulating the relationship between ITC's and LEC's. ITC's are unique business entities. They constitute the wholesale market for purchase of telecommunications services from local exchange companies. For non–ITC customers of LEC's, telecommunications services are an overhead item, but for ITC's those services are their "raw material," and can constitute a large portion of their total cost of doing business. ITC's can incur significant charges in a short period of time. In addition, assets of ITC's are often fully secured, with little or no assets available to satisfy unpaid bills.

The classification has a rational relationship to the purposes of the rule. The unique characteristics of ITC's clearly relate to creditworthiness and rationally relate to the type of protection afforded by the deposit rule.

The principal question is: "who should bear the risk of ITC defaults?" Under the existing deposit rule (refund of deposit after 12 months of payment without delinquency), LEC's and their ratepayers bear the risk passed on in rate increases. The Commission agreed with Pacific Northwest Bell that since ITC's stand to profit from the financial enterprises posing ITC default risks to LEC's, ITC's should bear the risk. The weighing of policy objectives is within the province of the Commission. The statutory policies of preserving universal service and ensuring that customers pay reasonable charges for service are legitimate policy goals. RCW 80.36.300(1), (3). While some ITC's would weigh policy objectives differently, this does not mean the deposit rule is unconstitutional.

The "rational basis" test requires that the challenger do more than merely challenge the wisdom and expediency of the statute. *Brewer v. Copeland,* 86 Wn.2d 58, 61, 542 P.2d

445 (1975). It must be shown conclusively that the classification is contrary to the legislation's purposes. *Yakima Cy. Deputy Sheriff's Ass'n v. Board of Comm'rs, supra,* at 836. The classification must be "purely arbitrary" to overcome the strong presumption of constitutionality applicable here. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78, 55 L. Ed. 369, 31 S. Ct. 337, 340 (1911).

### Exercise of Authority by Commission Under Equal Protection and Privileges and Immunities Clauses

In this case, the rational basis test is satisfied: (1) the security deposit rule applies uniformly to similarly situated members of the class of ITC's; (2) there is a rational reason for distinguishing ITC's as a special class (presenting distinct credit risks for LEC's); and (3) the goal of protection for LEC's, and ultimately the public, is rationally furthered by the security deposit rule.

Consequently, neither the equal protection clause of the fourteenth amendment to the United States Constitution nor the special privileges and immunities clause of the Washington Constitution are violated by the security deposit rule.

### Summary and Conclusion

The security deposit rule was promulgated by the Washington Utilities and Transportation Commission according to proper enabling authority under RCW 80.01-.040 and RCW 80.36 setting forth the power of the Commission to regulate telecommunications "in the public interest" and to "[m]ake such rules and regulations as may be necessary to carry out its other powers and duties." Adequate fact–finding proceedings supported the Commission's decision to promulgate the security deposit rule.

The security deposit rule does not violate the commerce clause of the United States Constitution. Congress has provided for a dual state/federal regulatory system contemplating state plenary authority over intrastate telecommunications. The rule neither supplants federal requirements

nor places any different burden on interstate firms operating intrastate than those operating solely intrastate.

The security deposit rule does not violate the equal protection clause of the fourteenth amendment to the United States Constitution, nor does it violate the special privileges and immunities clause of the Washington Constitution. The rule satisfies requirements of the "rational basis" test for equal protection analysis of state economic legislation. There are reasonable grounds for distinguishing those within the class from those outside the class, and the classification of ITC's has a rational relationship to the purposes of the rule. The security deposit rule applies alike to all members within the designated class. Therefore no discrimination nor undue preferences result from its enforcement.

We therefore reverse the order of the trial court which invalidated WAC 480-120-057 and WAC 480-120-021. We approve the security deposit rule promulgated by the Washington Utilities and Transportation Commission on April 30, 1986.

CALLOW, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DORE, PEARSON, ANDERSEN, and DURHAM, JJ., concur.